MARVIN, Judge.
In this action for water damage that allegedly arose out of the obstruction of a natural drainage servitude by defendants, defendants appeal a $5,700 judgment in favor of plaintiff.
Defendants challenge the correctness of the trial court’s factual findings that the servitude existed and that defendants obstructed it and caused the plaintiffs property to flood.
Finding no error in either respect, we affirm.[1]
LAW
The properties occupied by plaintiff and defendants are contiguous. The plaintiff, Tool House, Inc., having no written servitude agreement, claims a natural rather than a conventional servitude. Natural servitudes arise from the natural situation of estates. CC Art. 654. The natural servitude of drainage is defined, and the obligations of the owners of the adjoining estates are set forth, in CC Arts. 655 and 656:
Art. 655. Natural drainage
An estate situated below is bound to receive the surface waters that flow naturally from an estate situated above unless an act of man has created the flow.
Art. 656. Obligations of the owners
The owner of the servient estate may not do anything to prevent the flow of the water. The owner of the dominant estate may not do anything to render the servitude more burdensome.
The lessor-owner of the property leased by defendants was not made a party to the action. The parties do not dispute that the lessee of a servient estate of a natural servitude stands in the shoes of the owner of that estate and owes the same obligations to the dominant estate, if a natural servitude is found to exist.
FACTS
Tool House has owned the property at 510 Walnut Street in Monroe since 1972, using the northernmost part of its building as a retail store and the southernmost part as a warehouse. This action arose from the warehouse being flooded with rainwater on July 4, 1988, after a heavy rain of over three inches in two hours.
The south wall of the warehouse is the north wall of the building that defendants occupy. Defendants began leasing this property and a contiguous lot in 1986. Our rough sketch, not to scale, shows the relationship of the properties respectively occupied by plaintiff and defendants, the ditch, drainage pipe and fence about which the witnesses testified:
*722 [[Image here]]
Monroe Office Equipment Company occupied the Tool House property from 1946 until Tool House acquired the property in 1972. Two officers of Monroe testified that water at the rear of their building drained south to Olive Street, even before the ditch behind the building was built in the 1950’s.
After some minor flooding in Monroe’s building in the 1950’s, Monroe, on the north, and the then owner of defendants’ property, on the south, verbally agreed to facilitate drainage toward Olive Street on the south by building a concrete drain or ditch behind the Monroe property and installing a six-inch steel pipe culvert underneath the defendants’ property. Witnesses could not say whether the present six-inch pipe is the same pipe that was installed in the 1950’s.
No further flooding occurred in plaintiff’s warehouse building for more than 20 years after the ditch and pipe were installed. In 1982, about four years before the defendants began occupying the property at 500 Walnut Street, some flooding occurred in the lowest elevation of plaintiff’s warehouse. It was then discovered that vegetation and debris had obstructed and stopped up the six-inch steel culvert. The then owner of defendants’ property cleaned out and opened the culvert. No further flooding occurred until 1988, after defendants occupied the property and erected a sheet metal fence in 1986. This was done, defendants explained, to comply with “city regulations.”
When defendant Travis Tynes discussed the location of the fence with Tool House’s president, Robert Hanna, in 1986, Hanna told Tynes that the “drainage ... had to be kept open” to prevent water from entering the Tool House warehouse.
The sheet metal fence defendants erected in 1986 paralleled the east side of the ditch and then crossed the ditch a few feet south of the warehouse. See sketch above and photos below. Defendants attached a PVC *723 pipe to the northern end of the steel culvert. This PVC extension, beginning on defendants’ property, ended at the south end of the Tool House property. When Tynes was asked if he talked to Hanna about the PVC extension, he answered:
I didn’t ask him about putting it there. I put it there and then I told him that it was there so that I was trying to prevent further problems.... I put it on his side of the ditch, so that I would not have to maintain and see that that open ditch over there was completely open at all times, to keep the debris out from my side.
The bottom of the sheet metal fence crossing the ditch originally was very close to the ground. On the south side of the fence, defendants placed a trash dumpster and a stack of sheet metal panels that leaned against a storage shed. After the July 4 flood, defendants removed the PVC pipe extension and cleared debris from the drainage ditch behind the Tool House property at Hanna’s request. Defendants also cut away and removed some of the sheet metal, raising the bottom of the fence about 12-18 inches from the ground. No flooding occurred after the bottom of the fence was raised several months before the trial. These photographs show the fence and the rear of the Tool House property before (P-3) and after (P-6) the fence was cut and the PVC pipe removed:
*724 [[Image here]]
[[Image here]]
*725 Hanna testified that most of the water draining from the roof of the Tool House building runs south to Olive Street, with some of it draining west to Walnut Street, and that the Tool House parking lot north of the building drains north to Pine Street. His testimony was corroborated by John Maroney, an expert engineer, whose drainage study of the area showed that about half of the water from the Tool House building drains into the ditch behind the building, which directs it south to Olive Street. Other water from the roof drains west into Walnut Street or north to Pine Street.
Maroney’s measurement of the floor elevations in the Tool House and Hatcher-Tynes buildings showed that the lowest slab elevation in the Tool House warehouse was 2V2 inches higher than the slab of the Hatcher-Tynes building, and was one inch higher than a concrete lip at the rear door of the Hatcher-Tynes building.. No water entered the Hatcher-Tynes building on July 4, 1988.
Because the higher of the two buildings, the Tool House warehouse, flooded on July 4, 1988, and the lower of the two, the Hatcher-Tynes building, did not, Maroney opined that the flooding was caused by a “drainage restriction” between the two properties. He explained that without a restriction, the water from the Tool House property “should have sheet flowed” over the lower Hatcher-Tynes property to Olive Street. In Maroney’s opinion, “either the fence or additional material [on defendants’ side of] the fence,” such as the dumpster and the stacked sheet metal panels, restricted the water flow.
Maroney also testified that the six-inch steel drainage pipe across the rear of the Hatcher-Tynes property was inadequate to drain the area in a heavy rain. According to his calculations, three six-inch pipes, or one ten-inch pipe, are required to handle the “one in 25-year [rainfall] storm” of July 4, 1988.
Hatcher-Tynes’ expert engineer, Mur-dock Snelling, Jr., said he did not disagree with Maroney’s calculations and opinions. Snelling found the steel pipe blocked when he examined it a few days before trial, admitting that the six-inch pipe was inadequate in a heavy rain even if the pipe were not obstructed. Travis Tynes also found the pipe stopped up when he examined it on the day of trial, May 2, 1989. No witness testified about the pipe’s condition on July 4, 1988.
TRIAL COURT FINDINGS The trial court found:
... that defendant’s estate was situated below plaintiff’s ... and that the water drains naturally, from the rear of the Tool House premises south, across the rear of 500 Walnut Street to Olive Street. Thus, 500 Walnut Street is burdened with a natural servitude of drain in favor of 510 Walnut Street. Until defendants erected the solid sheet metal fence and stored materials adjacent to it, the plaintiff’s property had drained more adequately, apparently because of the ability of the water to sheet across the rear of defendant’s property_ ■ [T]he defendants’ acts, by erection of the fence and placement of materials adjacent to it, restricted the natural flow of the water and caused the flooding of plaintiff’s property.
These factual findings are challenged by Tynes in several respects. We do not disturb them unless we find from the record that they are clearly wrong. J B. LaHaye Farms v. La. Dept. of Highways, 377 So.2d 1286 (La.App.3d Cir.1979), writ denied.
ARGUMENT
In challenging the trial court’s finding that a natural servitude exists, Tynes argues that “Pine Street to the north is lower in elevation than Olive Street to the south” and that “there was no natural flow of water to Olive Street.” These assertions were not made by any witness, lay or expert, and cannot reasonably be inferred from the evidence.
The natural flow of water from the rear of the Tool House building south to Olive Street was established by the testimony of present and former building occupants and *726 corroborated by Maroney’s drainage study. Snelling agreed with Maroney’s calculations and opinions.
Under CC Art. 655, the natural servitude of drainage exists only for natural water flow and not for water flow created by “an act of man.” Tynes contends that even if the natural flow was originally to Olive Street, it has been changed by Tool House’s grading and páving of a gravel parking lot north of its building, and by other “acts of man.” While there is.evidence that the parking lot was paved at some unspecified time between 1972 and 1988, there is no evidence that this changed the natural flow of water from the rear of the Tool House building, which has always drained south to Olive Street. Water from the parking lot drains north to Pine Street and does not increase the flow across the rear of the Hatcher-Tynes property, according to the experts.
Tynes argues:
The only servitude the trial court should have recognized was the conventional servitude for the plaintiff to continue to use the 6 inch drainage pipe that was permitted [to be placed across the Hatch-er-Tynes property by a prior owner] and which has remained in use since the nineteen fifties. ... [T]he placing of the drainage pipe under the ground changed the natural flow, and the plaintiff’s right of flow became restricted to the 6 inch pipe.
An owner whose land drains naturally onto the land of his neighbor may install conduits on his own land, and on the neighbor’s land with the neighbor’s permission, to concentrate and speed the flow of water beyond the slow natural process by which it would ultimately reach its destination, provided this does not increase the amount of water that flows over the neighbor’s land. Freestate Industrial Development Co. v. T. & H., Inc., 209 So.2d 568 (La.App.2d Cir.1968), writs denied.
There is no evidence in this record that the installation of the drainage pipe increased or otherwise changed the flow of water across the Hatcher-Tynes property, as Tynes argues. Tynes has shown no factual or legal basis for limiting the servitude to the six-inch pipe, which both experts agreed was inadequate to handle the water flow from a heavy rain.
Tynes argues the flooding was caused by blockage in the six-inch pipe, which had caused flooding of the Tool House warehouse in 1982, before the sheet metal fence was erected. Tynes also contends that it was Tool House’s duty to clean debris from the pipe.
We need not decide whose duty it was to keep the pipe clean. There is no evidence of the pipe’s condition on July 4, 1988. The expert witnesses agreed that the pipe, even if unobstructed, was inadequate to handle a heavy rain, and that the rear of the Tool House property could effectively drain only if water could “sheet flow” across the Hatcher-Tynes property as well as draining through the pipe. The 1982 flooding, when the pipe was blocked but the surface of what is now the Hatcher-Tynes property was not obstructed, affected only the lowest area of the Tool House warehouse. After the surface was obstructed by the fence and other things in 1986, the entire warehouse flooded in 1988.
The trial court found that the Tool House property “had drained more adequately, apparently because of the ability of the water to sheet across the rear of defendant’s property,” before the fence was erected and materials were stored next to it, and that those surface obstructions caused the 1988 flooding. On this record, we cannot say these findings are clearly wrong. See and compare Wappler v. Braucht, 209 So.2d 603 (La.App.2d 1968), writ not considered.
DECREE
Costs of the appeal are assessed to Tynes, and the judgment is AFFIRMED.
ON APPLICATION FOR REHEARING
Before MARVIN, SEXTON, HIGHTOWER, HALL and NORRIS, JJ.
Rehearing denied.

. Throughout most of the record, the defendants are identified as Travis Tynes and Hatch-er-Tynes Roofing and Sheet Metal Works, Inc. Although the judgment was rendered against both defendants, in solido, it is incorrectly captioned “Tool House, Inc. v. Travis Tynes d/b/a Hatcher-Tynes Roofing and Sheet Metal Works, Inc.” The appeal was taken by Tynes d/b/a the corporation. Because we affirm the judgment, we do not reach the issue whether the order of appeal is effective as to both defendants or only as to Tynes individually.