818 So.2d 192 (2002)
Linda Ruth JACKSON
v.
Theresa JACKSON and Tap-J Industries, Inc.
Tap-J Industries, Inc.
v.
Linda Jackson and Donald Townsend.
Nos. 2000 CA 2591, 2000 CA 2592.
Court of Appeal of Louisiana, First Circuit.
March 6, 2002.
*194 Robert H. Harrison, Jr., Denham Springs, Counsel for Plaintiffs-First Appellants Linda Jackson and Donald Townsend.
A. Shelby Easterly, III, Connie M. Eversberg, Denham Springs, Counsel for Defendants-Second Appellants Theresa Jackson and Tap-J Industries, Inc.
Before: CARTER, C.J., PARRO, and CLAIBORNE,[1] JJ.
IAN W. CLAIBORNE, J. Pro Tem.
These appeals arise out of a dispute between adjacent landowners in Livingston Parish concerning the exercise, maintenance, and modification of a predial servitude of drain. Each party filed a lawsuit seeking injunctive relief and damages against the other. After an initial hearing regarding injunctive relief, the actions were consolidated for trial, a judgment was rendered, and the parties are now before this court on cross appeals.

FACTS AND PROCEDURAL HISTORY
These lawsuits involve certain property in Livingston Parish that was all originally owned by a single owner, Thomas C. Jackson. In approximately 1946, Mr. Jackson attempted to provide drainage for his property (the T.C. Jackson property) by digging a series of shallow ditches throughout the property. As part of this drainage plan, Mr. Jackson constructed a ditch that flowed from west to east across his property. The water flowing through this ditch eventually emptied into Colyell Creek.[2] Because his property did not extend all the way to the creek, Mr. Jackson obtained an easement from Gaylord Container Company, the adjoining landowner to the east, which allowed him to construct another ditch connecting the west-east *195 ditch on his property to the creek. There is a written agreement establishing this easement on the Gaylord property,[3] but no written document exists detailing the drainage plan involving the ditch on what is now lot 4 of Mr. Jackson's former property.
Mr. Jackson died on April 10, 1966. Two years later his property was partitioned among his heirs and his widow. On May 5, 1971, his children partitioned the property allocated to them in indivision in the 1968 partition with their mother. His daughter, Linda Ruth Jackson, obtained lots 4, 5, and 8 of the newly partitioned property. The ditch at issue runs from west to east in the southern portion of lot 4. It is situated about 15 feet north of lot 3 on the west end of lot 4 to about 42 feet north of lot 3 on its east end. All of this portion of the ditch from west to east is contained within lot 4. (The head of the ditch is over 600 feet to the west of lot 4 where it intersects with two ditchesone from the south and one from the north both of which flow into the subject ditch.)
By virtue of partitions and other acts, Theresa Jackson, the former sister-in-law of Linda Jackson, and Tap-J Industries, Inc., a Louisiana corporation wholly owned by Theresa Jackson, obtained lots 1, 2, 3, 6, 7, 9, 10, and 11 of the T.C. Jackson property. (Tap-J Industries and Theresa Jackson are hereinafter referred to as the developers.)
The T.C. Jackson property subdivision created by partition among the heirs has the following general configuration. On the northernmost portion of the property there is a row of four lots, numbered 9, 10, 11 and 12 from west to east. Immediately south of, and abutting, these lots is another row of four lots, numbered 5, 6, 7 and 8 from east to west. Immediately south of lot 5 is a row of four lots running from north to south and numbered 4, 3, 2 and 1.
Lot 3 belongs to the developers. Lot 4 is the property of Linda Jackson. This litigation is concerned mainly with these two lots. In addition to the lots above mentioned, the developers obtained an additional 20.82-acre tract of land that had also been part of the original T.C. Jackson property and had been allocated to Mr. Jackson's widow in the 1968 partition. This 20.82-acre tract adjoins lots 1, 2, and 3 on their western boundaries.
From the time of its initial construction, the ditch received little or no maintenance. The ditch had not been maintained at all for several years prior to 1995. Throughout this time, the ditch was shallow and only approximately 36 inches wide at the point where it entered the Gaylord property. It was fed by a single 24-inch culvert that ran under Mayer Street to the west of lot 4.[4] Due to the many years of neglect, numerous small trees or saplings and shrubs had grown up in the bed of the ditch.
In 1995, the developers took steps to create a subdivision named Madison Oaks on their land. In connection with these plans, the developers hired a contractor to clear the ditch on lot 4 to improve the drainage of their property. The contractor entered lot 4 without prior notification to Linda Jackson and proceeded to clear the trees and shrubs from the existing ditch. In doing this work, the contractor cleared trees and brush in a wide path on *196 Linda Jackson's property, and also significantly deepened and widened the existing ditch. In addition, the contractor left piles of debris and spoil on the property, and survey markers were disturbed. All of this clearing and dumping took place on the north side of the ditch on lot 4, rather than on the south side of the ditch closer to the developers' property.
On August 22, 1995, Linda Jackson filed suit in Livingston Parish against Theresa Jackson seeking damages for these actions, as well as a temporary restraining order (TRO) and a preliminary injunction.[5] A TRO was issued ex parte without prior notice to the developers, but it was subsequently dissolved on August 31, 1995.[6]
In October of 1995, after the dissolution of the TRO, the developers again entered lot 4 to further modify the ditch. Specifically, the developers removed the original culvert that ran under Mayer Street and replaced it with three 36-inch culverts. The developers also dug a new 4 ½-foot by 15-foot ditch along the southwest boundary of lot 4 near Mayer Street, where no ditch had previously existed. This new ditch was placed so that it also drained into the existing ditch. Finally, a new 42-inch culvert was installed in connection with the new ditch.
Almost immediately after these modifications and installations were completed, Linda Jackson began to have problems with flooding and standing water on her property, even after periods of only moderate rainfall. Therefore, in April of 1996, Linda Jackson attempted to restore the ditch to its original condition. To that end, she completely blocked off two of the three 36-inch culverts, and partially blocked the third culvert so that it had only a 24-inch opening. She also purchased 2,448 cubic feet of dirt and used it to fill up the ditch to what she alleged was its original depth.
In response to these actions, Tap-J Industries filed suit against Linda Jackson and her husband, Donald Townsend, seeking damages and injunctive relief. A hearing on the request for the preliminary injunction was held on July 15, 1996. Ultimately, the trial judge determined that a servitude of drain created by destination of the owner existed over lot 4 in favor of the developers' property. The trial court then granted the preliminary injunction preventing Linda Jackson and her husband from obstructing or filling the drainage ditch and further ordered them to remove the fill dirt and any other obstructions to drainage. The remaining issues of damages raised in each of the lawsuits were consolidated for trial.
A trial on these issues was held on February 17, 2000. The trial judge reiterated his finding that a predial servitude of drain created by destination of the former owner existed across lot 4 in favor of the property of the developers. Linda Jackson and her husband were permanently enjoined from obstructing or interfering with that servitude of drain. In addition, the court awarded damages in the amount of $12,500 to Linda Jackson, because "the *197 property was not returned to the same condition prior to the storing of the spoil," but denied any award of damages for trespass or for Linda Jackson's claim that the exercise of the servitude had become more burdensome. Finally, the court awarded damages to the developers in the amount of $2,500 for wrongful issuance of the original TRO, and also awarded them damages in the amount of $10,000 for damage to improvements in the subdivision caused by the blockage of the culverts. Both parties have filed devolutive appeals to this court.

ASSIGNMENTS OF ERROR
Linda Jackson relies on four assignments of error in attempting to reverse the decision of the trial court. Specifically, she contends, in assignments of error numbers 1 and 2, that the developers' actions with respect to the ditch on lot 4 amounted to an unlawful modification of the existing servitude and rendered the exercise of the servitude more burdensome on the servient estate. She also challenges, in assignment of error number 3, the failure of the trial court to find that the developers had committed a trespass on lot 4 by constructing a new ditch. In assignment of error number 4, she contends the court erred by finding her in violation of the TRO and awarding damages therefor. Actually, the developers did not pray for a TRO. Although the order signed by the court is entitled "Temporary restraining order and rule to show cause," it only orders Linda Jackson and her husband to show cause why a preliminary injunction should not issue restraining, enjoining and mandating various acts. Judgment ordering the preliminary injunction was not rendered until October 2, 1996. Moreover, the trial court did not find her in violation. Finally, she argues that the trial court should not have awarded damages in favor of the developers for the blockage of the ditch.
The developers have also appealed citing two assignments of error, both revolving around the issues of the awards of damages by the trial court. The developers first argue that they should have been awarded more damages as a result of the actions of Linda Jackson and her husband in blocking and otherwise obstructing the ditch. In addition, they dispute the amount of damages awarded by the trial court in favor of Linda Jackson for physical damage to her property caused by the developers' actions.

DISCUSSION

Servitude of Drain
The trial court found that a servitude of drain created by destination of the owner existed over lot 4 in favor of the land of the developers.[7] Article 741 of the Louisiana Civil Code provides:[8]
Destination of the owner is a relationship established between two estates owned by the same owner that would be a predial servitude if the estates belonged to different owners.
When the two estates cease to belong to the same owner, unless there is express provision to the contrary, an apparent servitude comes into existence of right and a nonapparent servitude comes into existence if the owner has *198 previously filed for registry in the conveyance records of the parish in which the immovable is located a formal declaration establishing the destination.
(Emphasis added.)
A servitude of drain is an apparent servitude. See La. Civ.Code art. 707 (former La. Civ.Code art. 728). Therefore, when the T.C. Jackson property was partitioned and allotted to different owners, the servitude of drain came into being of right, without the necessity of filing any formal declaration.

Modification of Existing Servitude
In addition to the obvious right of drain embodied in the servitude, the owner of the dominant estate has certain ancillary rights necessary for the use of the servitude that are acquired at the time it is established. See La. Civ.Code art. 743 (former La. Civ.Code art. 771). The owner of the dominant estate also has the right to make all works necessary for the use and preservation of the servitude at his expense. La. Civ.Code art. 744 (former La. Civ.Code arts. 772 and 773). The owner of the dominant estate also has the right to enter the servient estate, pursuant to article 745 of the Civil Code (former La. Civ.Code art. 774), which provides as follows:
The owner of the dominant estate has the right to enter with his workmen and equipment into the part of the servient estate that is needed for the construction or repair of works required for the use and preservation of the servitude. He may deposit materials to be used for the works and the debris that may result, under the obligation of causing the least possible damage and of removing them as soon as possible.
There is no requirement that the owner of the dominant estate request permission from the owner of the servient estate to exercise these rights.
Although these articles grant certain rights to the owner of the dominant estate, they also impose restrictions and obligations on such owner. First, the maintenance, repair, or construction carried out must be necessary or required for the use or preservation of the servitude. La. Civ. Code arts. 744 and 745. In addition, the owner of the dominant estate must exercise these rights in such a way as to cause the least damage and inconvenience to the servient estate. La. Civ.Code arts. 743 and 745.
In applying these principles to the case before this court, it is clear that the developers had the right to enter lot 4 to repair and maintain the ditch. They did not need Linda Jackson's permission to enter, because the right to do so was conveyed to them by law at the time the servitude was established. The inquiry does not end there, however. The developers' actions must have been necessary and must have been carried out in a manner least inconvenient or damaging to the servient estate.
In connection with their plans to establish Madison Oaks subdivision on their property, the developers entered lot 4 and began to deepen and widen the pre-existing ditch. Prior to these modifications, the ditch had been shallow and was only approximately 36 inches wide. Although the exact post-development measurements of the ditch are not in the record, it is clear from the photographs and testimony introduced at trial that the ditch was substantially wider and deeper once the modifications were completed.
The developers presented testimony from Wayne Sledge, who was qualified as an expert in the field of civil engineering. In addition to testifying as an expert witness at trial, Mr. Sledge was involved in the planning and design of the drainage system for Madison Oaks subdivision. At *199 trial, Mr. Sledge testified concerning the design of the drainage system and stated that it was necessary to deepen the ditch in order to properly drain the subdivision. However, Mr. Sledge also testified that although it may have been necessary to reshape the sides of the ditch somewhat, it was not necessary to widen the ditch to implement the drainage system.
Nevertheless, the ditch was in fact widened substantially and deepened in connection with the modification of the ditch. Therefore, the area of the servient estate subject to the servitude was increased, and the owner of the servient estate lost the use of an additional part of her property. It should be noted that since this was an apparent servitude, not established in writing, the dimensions of the servitude are determined by what was apparent at the time it was created, i.e., when the owners partitioned the property. After trial of the preliminary injunction, the trial court found that the actions of the developers constituted remedial efforts to restore the servitude. However, there was no evidence, at that hearing or at the subsequent trial of the consolidated cases, regarding the dimensions of the servitude at the time of its creation by the co-owners' partition of their property.
In addition to the question of the necessity of the work, the manner in which the work on the ditch was carried out must be considered. The owner of the dominant estate is required to carry out its work in a manner that causes the least damage or inconvenience to the servient estate. The developers clearly did not comply with this requirement.
Both the northern and southern banks of the ditch at issue are within the boundaries of lot 4. The ditch itself is at the southern end of the lot and runs more or less in the same direction as the property line dividing lot 4 from lot 3 to the south. The bulk of lot 4 lies to the north of the ditch. However, a relatively narrow strip of land belonging to lot 4 lies to the south of the ditch between its southern bank and lot 3.
Mayer Street lies to the west of lot 4 and runs approximately north-south along the edge of the lot. The three 36-inch culverts installed by the developers that feed the ditch from the west are situated under Mayer Street where it crosses over the ditch. Therefore, both the north and south sides of the ditch are accessible from Mayer Street. However, when the developers entered lot 4, they entered from Mayer Street onto the north side of the ditch rather than on the south side of the ditch. John Easterly, the construction supervisor, testified that the decision was made to enter from the north side because it offered the path of least resistance for the crew. The trial court found that the ditch was only modified so as to conform with current accepted engineering standards. These reasons are not acceptable.
When performing work to preserve or maintain the servitude, the owner of the dominant estate must act in such a manner as to cause the least damage or inconvenience to the servient estate. La. Civ. Code arts. 743 and 745. While it may be true that entering the lot on the north side of the ditch allowed the developers to do the work more quickly and more conveniently while knocking down fewer trees and shrubs to gain access to the property, the convenience of the owner of the dominant estate is immaterial. The impact on the servient estate is the crucial question.
By conducting all of the clearing, excavating, and widening of the area on the side of the ditch containing the bulk of lot 4, the developers have rendered more of the servient estate unusable to its owner. Prior to the modification of the ditch, the *200 area south of the ditch on the servient estate, although perhaps inconvenient for use by the owner because it was separated from the bulk of the estate by the ditch, was nevertheless readily accessible. Had the developers made their modifications on the south side, whatever damage there may have been to the servient estate would have been minimal. Instead, the developers conducted the work entirely on the north side of the ditch, which resulted in the creation of a "dead zone" 40 feet wide on the servient estate.
The application of accepted engineering standards as a justification for the acts of the owners of the dominant estate is not proper. Current accepted engineering standards may be relevant to the necessity for taking (such as, the route and dimensions of a highway or placement of a pipeline or the widening of servitudes for such purposes) in a case involving an entity with powers of expropriation, but such standards do not govern the relative rights of private property owners among themselves. The developers in this case do not have a right of expropriation, nor have they tried to claim such a right. A servitude once established can not be enlarged or made more burdensome on the servient estate simply because current accepted engineering standards would so dictate.[9]
The trial court denied Linda Jackson's claim for damages for this dead zone, reasoning that she could have prevented the damage by negotiating with the developers or by petitioning the court to order the developers to move the ditch to a more convenient location on her property. There is no obligation under the law that would require Linda Jackson to negotiate with her neighbors or that would require her to file a suit prior to the damage to her property. The court determined that the widening and clearing on the north side of the ditch was appropriate, but implied that taking the same action on the south side of the ditch, without Linda Jackson's approval, would have amounted to an unlawful modification of the servitude by the developers.
Because the width of the ditch is contained entirely within lot 4, the developers had to enter Linda Jackson's property in order to work on the ditch. Moreover, the developers would still have had to clear trees from the property in order to bring the equipment onto the lot regardless of which side of the ditch they entered. The only difference is that if the work had been done on the south side of the ditch, the damage to the servient estate would have been considerably less than was actually caused. Accordingly, Linda Jackson, as the owner of the servient estate is entitled to an award of damages for the physical damage to her property.

Increased Burden on the Servient Estate
The trial court also denied Linda Jackson's claim that the modifications to the ditch rendered the exercise of the servitude more burdensome to the servient estate. In denying this claim, the trial court found that the ditch had always been intended to drain the same surface area of land. Therefore, the judge reasoned that any changes brought about by the subdivision of the property and the modifications to the ditch could not render the exercise of the servitude more burdensome. We disagree.
*201 Article 747 of the Civil Code (former La. Civ.Code art. 776) provides:
If the dominant estate is divided, the servitude remains due to each part, provided that no additional burden is imposed on the servient estate. Thus, in the case of a right of passage, all the owners are bound to exercise that right through the same place.
This article clearly contemplates that there might be a division of the dominant estate requiring that the servitude remain due to each part so divided, but prohibits the imposition of an additional burden on the servient estate as a result of that division. Therefore, the question of whether or not the modifications to the ditch made necessary by the subdivision of the dominant estate rendered its use more burdensome to the servient estate still remains to be addressed.
In order to prove that there had in fact been an increase in the burden on her estate, Linda Jackson presented expert testimony from George Hudson, a civil engineer who conducted drainage impact and hydrological studies on lot 4. Mr. Hudson studied the rate of flow and volume of water drained through the ditch in both pre-development and post-development conditions. These studies indicate that there was a significant increase in both the volume and rate of flow of water onto the servient estate in its post-development condition.
To counter this evidence from Mr. Hudson, the developers presented testimony from William Addison, who was also qualified as a hydrology expert. Mr. Addison did review topographical studies and other data concerning the development in preparation for his testimony, but he did not conduct any studies concerning the flow through the ditch on lot 4. Moreover, he testified that he had not in fact seen lot 4 or the ditch in question in its pre-development state.
When questioned by counsel for the developers as to whether or not there had been an increase in the volume of the water flowing into the ditch, Mr. Addison initially responded simply that the surface area of the land being drained into the ditch was the same. During cross-examination, Mr. Addison ultimately acknowledged that there probably had been an increase in the volume of the flow, but denied that it was a significant increase.
Although they disagreed as to the significance of the increase, both experts testified that there had been an increase in the volume of water flowing into the ditch. The only statistical evidence in the record indicated that the post-development increase in both the volume and rate of flow through the ditch was significant. While an increase in the rate of flow alone is not considered an increased burden, an increase in the volume of water flowing over the servient estate can constitute an increase in the burden imposed on the servient estate. East Baton Rouge Parish v. Pourciau, 387 So.2d 645, 647-648 (La. App. 1st Cir.1980); Tool House, Inc. v. Tynes, 564 So.2d 720, 726 (La.App. 2d Cir.), writ denied, 568 So.2d 1087 (La. 1990).
Perhaps more important than the simple statistical evidence is the uncontested evidence of flooding on the servient estate. Linda Jackson testified that she began to experience problems with flooding on her property almost immediately after the modifications were made to the ditch on lot 4.[10] In fact, the uncontroverted testimony *202 at trial was that her property had flooded many times between October of 1995 and February of 1998, when she stopped keeping track. She further testified that she had never had problems with flooding before the modifications, and that she now has significant flooding on her property during only moderate to light rainfall.
The trial judge denied Linda Jackson's claim for full damages on account of the flooding because he found that the flooding was due to her own actions, including her objections to clearing and restoring the drainage ditch all the way to Colyell Creek and her refusal to allow work crews from the parish drainage district to enter her property for this purpose. The fact is that Linda Jackson was not in a position to prevent the cleaning and restoration of the ditch across the Gaylord property.
The servitude over the Gaylord property is separate and distinct from the apparent servitude on lot 4 which has been under discussion. The Gaylord property servitude was created by written agreement between Mr. T.C. Jackson and the Gaylord Container Company. As a result of that agreement, the Gaylord property became the servient estate and the Jackson property became the dominant estate. When the Jackson property was partitioned the dominant estate became several estates, and the servitude became due to each portion. La. Civil Code art. 747 (former La. Civ.Code art. 776). The servient estate (Gaylord property) became subject to the servitude of the several estates. See La. Civil Code art. 724 (former La. Civ.Code art. 745). It is not necessary that the estates be contiguous. La. Civil Code art. 648 (former La. Civ.Code art. 651). The owner of any of the new estates or lots which benefited from the servitude on the Gaylord property was in a position to exercise her rights as owner of a dominant estate, subject only to the codal prohibition against placing an additional burden on the servient estate. Any objections by Linda Jackson (except as to the unnecessary crossing of her property) could have no legal effect on the exercise of the rights of the other owners. The servitude over the Gaylord property is 40 feet wide, and there was no showing that such width was inadequate to maintain the servitude. (The record is also devoid of an explanation of the parish drainage district's connection with the matter.)
The water flowing through the ditch on lot 4 continued to flow to the east into a ditch on the Gaylord property and into Colyell Creek. Although the developers made extensive modifications to the ditch on lot 4, there were no immediate modifications made to the ditch on the Gaylord property, ostensibly because of Linda Jackson's objections. That ditch remained shallow and approximately 36 inches in width, as the ditch on lot 4 had been prior to the modification. The increased amount of water flowing through the ditch on lot 4 could no longer flow properly into the ditch on the Gaylord property, thus causing the flooding on the servient estate of Linda Jackson.
The modifications on lot 4 began in August of 1995. A TRO was issued in August of that year, but it was recalled on August 31, 1995. Thereafter, in October of 1995, the developers entered lot 4 to continue the modifications. It was after these modifications that Linda Jackson began to experience flooding on her property.
The first hearing in this matter was held on July 15, 1996. At that hearing, both Linda Jackson and George Hudson testified that no remedial efforts had been made to open the ditch all the way to Colyell Creek. Specifically, the following exchange took place between the trial judge and Linda Jackson:
THE COURT:

*203 When the subdivision was developed and these modifications were made, why wasn't it dug all the way across, do you know?
THE WITNESS:
I have no idea why they stopped. In fact, whenever Mr. Hudson came out he was flabbergasted. He said, look, they just dug it so far and left it. And it justthe ditch deteriorates to nothing and the water just flows out.
The developers offered no testimony or other evidence at that hearing to demonstrate that they had attempted to open that ditch, or that they had been prevented from doing so by Linda Jackson. There is testimony that she told the parish drainage district she did not want the work done. Linda Jackson did later testify at the trial on February 17, 2000, that, in fact, she did not want the drainage district to clear the ditch all the way to Colyell Creek at that time because she felt that the dimensions of the ditch had been sufficient to drain the area without flooding prior to the modifications. None of Linda Jackson's statements could be interpreted as an acquiescence on her part to the flooding of her property. It is true that an injured party has an obligation to mitigate his damages. Graf v. Jim Walter Homes, Inc., 97-1143, p. 12 (La.App. 1st Cir.5/15/98), 713 So.2d 682, 692. However, the evidence in the record demonstrates that Linda Jackson had begun to experience flooding on her property almost immediately after the modifications on the ditch in October of 1995.
On July 15, 1996, Linda Jackson testified to this flooding without contradiction by the developers, and no evidence was introduced at that time to indicate that she had prevented the developers or anyone else from correcting the problem. No evidence was ever introduced to demonstrate at what point Linda Jackson may have prevented the remedial work from taking place. The only evidence on the issue is that at trial, almost five years after the flooding problems had begun, she declared her desire not to allow the work to take place. Linda Jackson is entitled to damages for the flooding she experienced on her property as a result of the actions of the developers.

Trespass
Linda Jackson also alleges that the trial court erred in denying her claim against the developers for trespass. The claim for trespass is based on the fact that the developers dug a new 4 ½-foot by 15-foot ditch along the southwest boundary of lot 4 near Mayer Street to connect to the existing ditch on the lot. There is no dispute that the developers dug this ditch where no ditch had previously existed. The conflict arises over whether or not the land on which it was constructed did in fact belong to Linda Jackson.
The party claiming a trespass has the burden of proving his ownership of the property. Bennett v. Louisiana Pacific Corporation, 29,598, p. 2 (La.App.2d Cir.5/9/97), 693 So.2d 1319, 1321, writ denied, 97-1552 (La.10/3/97), 701 So.2d 199. Linda Jackson attempted to demonstrate that the ditch had been dug on her property by submitting a photograph of the area, which showed a portion of the ditch extending beyond a white post. She further testified that the post was the boundary of her property and that the ditch was therefore clearly on her property.
The developers countered this argument by stating that the property on which the new ditch had been dug was actually within the Mayer Street right-of-way, which had been dedicated by Linda Jackson's family. Wayne Sledge testified that the ditch had been placed well within the right-of-way. Moreover, Linda Jackson *204 herself placed the ditch within the right-of-way when she pointed out its position on a map of the area at trial.
The trial court determined that Linda Jackson had not met her burden of proving that she was the owner of the property on which the new ditch had been constructed.[11] This is a factual determination, and it will not be reversed on appeal absent a finding of manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Based on the evidence in this record, we find no error.
If the ditch was constructed on the Mayer Street right-of-way, it was Linda Jackson's burden to show the type of dedication of such right-of-way, because the question of the ownership of the land under the right-of-way depends on the dedication. See Melancon v. Giglio, 96-2507, pp. 5-6 (La.App. 1st Cir.3/13/98), 712 So.2d 535, 539-540, wherein the classification of dedications is discussed. When the dedication conveys ownership of the land on which the servitude lies, the adjacent owner is not in a position to complain of a trespass on the servitude. If it does not, the adjacent owner, or owner of the land which is subject to the servitude, can complain of a trespass if the activity on the servitude exceeds or is incompatible with the nature and extent of the servitude.
The record in this case contains a partition document dated April 12, 1968, in which the heirs and widow of T.C. Jackson divided the property they had owned in indivision after his death. That document includes a paragraph dedicating Mayer Street "for the perpetual use of the public for street purposes, including rights-of-way for the installation of water mains...and other public utilities over, through, upon, under and across same...." The wording of this dedication is broad enough to encompass the drainage ditch and culverts installed by the developers on Linda Jackson's property adjoining Mayer Street. See Melancon v. Giglio, 96-2507 at 7-8, 712 So.2d at 540.

Damages
After the trial, the judge made three awards of damages. He awarded damages in the amount of $12,500 to Linda Jackson for the failure of the developers to remove all of the spoil and debris they placed on her property during the modification of the ditch. The trial court also awarded damages in the amount of $10,000 to the developers for the damage caused by Linda Jackson and her husband in blocking off the ditch. Finally, the trial court awarded damages in the amount of $2,500 to the developers for the wrongful issuance of the TRO. The award of damages for the wrongful issuance of the TRO has not been appealed, and it is therefore final. The remaining awards have each been challenged.

A. Developers' Damages
Both sides have appealed the award of damages to the developers for the blockage of the ditch. Linda Jackson argues that the award should not stand because the developers failed to prove that the blockage of the ditch caused the damages claimed by the developers.
*205 The developers sought damages for having to repair potholes and other defects in the road structure of the subdivision. To prove this claim, the developers presented testimony from John Easterly, the supervisor of the construction company performing the modifications. Mr. Easterly testified that the blockage of the ditch, which caused water to accumulate along the side of the newly constructed road beds, could cause a deterioration of the bed and cause potholes to form in the road. Although Mr. Easterly was not qualified as an expert, he did testify from his experience as a construction supervisor. Moreover, Linda Jackson did not object to Mr. Easterly's testimony on the grounds that he was not an expert.
A finding of causation is a finding of fact that must be reviewed on appeal under the manifest error standard. Housley v. Cerise, 579 So.2d 973, 979 (La.1991). We find no error in the trial court's finding of causation. Mr. Easterly testified that the build up of water caused the problems, and Linda Jackson did not present any contradictory evidence. Therefore, this assignment of error has no merit. In order to sustain this award of damages the court must have been satisfied that Linda Jackson filled up the ditch so as to reduce the size of the ditch beyond what it was before the improvements by the developers began. Otherwise, the undermining of the road and the creation of potholes would have existed before the improvement of the drainage began and could not have been caused by the actions of Linda Jackson.
The developers also appeal this award of damages, claiming that the trial judge failed to award the amount of damages they proved at trial. In connection with Mr. Easterly's testimony, the developers submitted a bill from Chandler's Enterprises for work they alleged was necessary as a result of the blockage of the ditch. The total amount charged pursuant to this bill was $24,227.75. The trial court only awarded damages in the amount of $10,000 rather than the full amount of the bill.
We find no error in this award. Mr. Easterly testified regarding the necessity of the work, but he also acknowledged that many times the contractor has to go back and make repairs such as these in the normal course of construction. Mr. Easterly seemed to be unable to remember the details of the work, such as when it was performed relative to the time of the blockage. Some of the damage was caused by Linda Jackson's attempt to restore the servitude to its former dimensions, but the court apparently was not satisfied that all the repairs were made necessary by the blockage. Therefore, we find no merit in these assignments of error.

B. Linda Jackson's Damages
The trial court also awarded damages to Linda Jackson in the amount of $12,500 for the spoil or debris that was not removed by the developers' contractor after the completion of the modification causing some flooding that she did not previously experience. The developers have challenged this award, claiming that Linda Jackson failed to prove that the contractor did in fact leave any spoil on lot 4.
The testimony before the court on this issue was conflicting. Linda Jackson testified that the spoil and debris were left on her property following completion of the work. In addition to her testimony, she submitted pictures of the area showing the condition of the property. In contrast to this, Mr. Easterly testified that he had removed all the debris and spoil caused by the modification, but had not removed the *206 debris that he claimed was already present prior to the development.
The trial court apparently believed Linda Jackson's testimony and awarded damages accordingly. When findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings. Rosell, 549 So.2d at 844. We find no manifest error in the trial court's decision on this issue. This assignment of error has no merit.
As mentioned above, Linda Jackson was entitled to damages for the creation, by the developers, of a dead zone on lot 4. (In expropriation cases, such damages would be referred to as consequential damages or severance damages.) She was also entitled to damages by virtue of the increased flooding of her property. These damages made the use of the servitude more burdensome to the servient estate.
Nevertheless, both of these items consist of property damage. In a claim for property damages, the plaintiff has the burden of proving the amount of damages. In the present case, there is no expert testimony comparing the relative value of the property before and after the damage was done. There is also no such evidence regarding the value of real estate in the area in question, nor of the value of property subject to flooding as compared to the value of property that is properly drained. Alternatively, there is no evidence of the estimated cost of repairing the damage. In short, had the trial court recognized Linda Jackson's right to these elements of damage, the record is devoid of evidence upon which the court could have based an award.

Injunctions
Any additional volume of water directed through the servitude would clearly overburden the servient estate and cause irreparable harm. Therefore, it would appear that Linda Jackson is entitled to injunctive relief. Having found that Linda Jackson is entitled to damages for the past activities on her land, any injunctive relief must be prospective. Therefore, an injunction shall issue prohibiting the developers from diverting or channeling any additional water or draining any additional property through the servitude on Linda Jackson's property, or otherwise overburdening the servient estate.

CONCLUSION
For the foregoing reasons, in these two consolidated cases, we affirm the award of damages by the trial court in favor of Linda Jackson in the amount of $12,500. We further affirm the award of damages in favor of Theresa Jackson and Tap-J Industries, Inc. in the amount of $10,000. Further, an injunction is issued in accordance with the foregoing. Each party is to bear the cost of her own appeal.
AFFIRMED; INJUNCTION ISSUED.
NOTES
[1] Judge Ian W. Claiborne, retired, is serving as judge pro tempore by special assignment of the Louisiana Supreme Court.
[2] This waterway is sometimes referred to in the record as "Middle Colyell Creek."
[3] The property is no longer owned by Gaylord Container Company. However, throughout the trial, the property was primarily referred to as the Gaylord property. For simplicity, we will continue that reference.
[4] There is some evidence that the original culvert was 36 inches by 48 inches rather than 24 inches, but that it was in a state of disrepair rendering it unusable.
[5] The lawsuit was originally filed naming only Theresa Jackson. However, the suit was amended on August 20, 1997, to include Tap-J Industries.
[6] The record indicates that Theresa Jackson filed a motion to dissolve or modify the TRO, which was set for hearing on August 31, 1995. A minute entry for that date indicates that the matter was taken up in chambers and a judgment was stipulated into the record. No signed judgment is in the record detailing what the court's decision was on that issue. However, it appears from elsewhere in the record that the TRO was dissolved by stipulation of the parties with the judge allowing the development of the subdivision to continue if it were done without further damage to Linda Jackson or her property.
[7] The owners in indivision created the servitude when the original estate was partitioned into numerous estates.
[8] There is no comparable article in the Louisiana Civil Code of 1870 (which was applicable at the time of the creation of the servitude), but this article, based on Articles 649, 767, 768 and 769 of that code, represents no change in the law. Unless there has been a change in the law, all references will be to the present Louisiana Civil Code.
[9] It would appear that if the servitude as originally established by the partition agreement is insufficient in width or depth to satisfy the engineering standards the developers desire, they have a right to dig a ditch on their own property to serve their needs and to make arrangements with the Gaylord property owners to connect with the servitude to which they and Mrs. Jackson have equal rights.
[10] It was stipulated that the testimony of Donald Townsend would be the same as that of his wife. Therefore, technically it cannot be said that Mrs. Jackson's testimony was uncorroborated.
[11] The record indicates that the judge originally found after the hearing on July 15, 1996, that there had in fact been a trespass. He made this determination based on Exhibit 1, which showed a ditch exiting from the northeastern portion of Madison Oaks subdivision and intersecting the existing ditch. However, at the later trial, the judge realized that the ditch shown on that exhibit was not the ditch at issue between the parties. He ultimately found that no trespass had been proven with respect to the ditch actually in dispute between the parties.