839 So.2d 82 (2002)
PALACE PROPERTIES, L.L.C.
v.
SIZELER HAMMOND SQUARE LIMITED PARTNERSHIP.
No. 2001 CA 2812.
Court of Appeal of Louisiana, First Circuit.
December 30, 2002.
Writ Denied April 4, 2003.
*86 Rodney C. Cashe, Hammond, for Plaintiff-Appellee Palace Properties, L.L.C.
J. Thomas Anderson, Hammond, Robert A. Kutcher, Metairie, for Defendant-Appellant Sizeler Hammond Square Limited Partnership.
Gwendolyn S. Hebert, New Orleans, for Defendant-in-Reconvention-Appellee Tangipahoa Parish Consolidated Gravity Drainage District No. 1.
Ronald S. Macaluso, Hammond, for Intervenor-Appellee City of Hammond.
Before: PARRO, JAMES, and PATTERSON, JJ.[1]
PARRO, J.
Sizeler Hammond Square Limited Partnership (Sizeler) appeals a declaratory judgment recognizing a conventional servitude of passage owed by it, as the owner of the servient estate, to Palace Properties, L.L.C. (Palace), the owner of contiguous property comprising the dominant estate (the Palace property), and allowing Palace to make improvements on that servitude of passage.[2] The judgment further declared that Sizeler's property is the dominant estate and the Palace property is the servient estate with respect to a natural and a conventional servitude of drain; these portions of the judgment are not contested on appeal. However, Sizeler challenges that portion of the judgment ordering Palace to install culverts beneath and within the confines of the servitude of passage in order to satisfy its obligation to drain Sizeler's property. Sizeler also contests the court's declaration that another conventional drainage servitude owed to Sizeler had *87 prescribed for non-use, its dismissal of certain damage claims asserted by Sizeler in its reconventional demand, and its denial of injunctive relief.

FACTUAL AND PROCEDURAL BACKGROUND
In this summary, we address only briefly the circumstances underlying the complex litigation involving the property at issue in this lawsuit.[3] Sizeler owns property in Tangipahoa Parish on which the Hammond Square Shopping Center (the mall) is located. Sizeler's ancestor-in-title, Sidney W. Lassen, purchased this property on September 17, 1973, from Palace's ancestor-in-title, South Ridge Park, Inc., Venance P. Lambert, and Maurice Lion.[4] Palace owns adjoining property to the north and west of Sizeler's property. In the 1973 Act of Sale, certain servitudes were created in favor of the Palace property, including a utility servitude and a servitude of passage. Both of these servitudes encumber an inverted "L"-shaped piece of land running parallel to and alongside the northern and western boundaries of Sizeler's property where the mall is located.[5] A portion of the property comprising the servitude of passage along the northern boundary was paved by Sizeler's predecessors-in-title in 1976, as part of the ring road for the mall. In 1981-82, C.M. Fagan Drive was constructed, incorporating the then-existing northern portion of the ring road and extending west to and through the Palace property to the U.S. Highway 51 Bypass (the Bypass); C.M. Fagan Drive became a major cross-town artery for public use, connecting the Bypass on the west and U.S. Highway 51 Business on the east.[6] However, the portion of the servitude of passage along the western boundary of Sizeler's property remained, for the most part, in its natural, undeveloped state.
In 1998, Palace notified Sizeler that, in connection with the development of a shopping center on the Palace property, it intended to construct a paved roadway along the western boundary of Sizeler's property, which would utilize the undeveloped portion of the servitude of passage. In early 1999, after Palace had taken certain preliminary steps with Sizeler's acquiescence, Sizeler informed Palace that it had concluded the servitude of passage had prescribed due to non-use and it would not allow the improvements; Sizeler eventually erected a fence to prevent Palace from *88 gaining further access to its property.[7] On May 4, 2000, Palace filed this lawsuit, seeking a declaration of its property rights, particularly the continued viability of the servitude of passage and its right to enter the Sizeler property and construct improvements on that servitude.[8] In a supplemental and amending petition, Palace averred that certain wording in the 1973 Act of Sale concerning the servitudes meant that either party's use of the servitude of passage inured to the benefit of both estates.
In addition to the denials in its answer, Sizeler pled as an affirmative defense that the servitude of passage had been extinguished because of Palace's non-use over a ten-year period. Sizeler also pled affirmative defenses of failure of consideration, failure of cause, and failure of a resolutory condition. Sizeler then asserted reconventional demands against Palace and others,[9] claiming that the defendants-in-reconvention had interfered with natural and conventional servitudes of drain owed to it. In addition, Sizeler alleged that certain acts of trespass on its property, interference with drainage, acts constituting conversion, and conspiracy to deprive it of its property rights by some of the defendants-in-reconvention, had caused and would continue to cause damage to Sizeler. Sizeler asked for a declaratory judgment recognizing its drainage servitude rights, various forms of injunctive relief, and monetary damages.
After voluminous discovery and many vigorously contested motions and exceptions, the case was tried on May 31 and June 1, 2001. In extensive written reasons, the trial court reviewed the evidence and concluded that the Palace property owed Sizeler's property a natural servitude of drain, as well as a conventional servitude of drain (the South servitude) that was outlined in green on a survey prepared by John E. Walker and attached to the 1973 Act of Sale.[10] The court then discussed a second conventional servitude of drain (the North servitude), shown in pink on that survey, which had intersected a drainage canal known as the W-2 L-2-B canal (the old canal) that formerly ran through Palace's property.[11] Noting that the old canal had been replaced by an improved canal in a different location when C.M. Fagan Drive was paved, the court *89 found that the North servitude had prescribed due to ten years of non-use. The court also concluded that the Drainage District had authority to relocate the drainage served by the old canal and that the formal abandonment of the old canal had been accomplished within that authority.
Regarding the conventional servitude of passage in favor of the Palace property, the court rejected some of the arguments proposed by Palace, but agreed that the evidence showed that the servitude was used for the benefit of the dominant estate within the applicable prescriptive period and had not prescribed. Referring to the construction and use of C.M. Fagan Drive by "innumerable members of the public," the court concluded that this use benefited Palace by improving the value of its property. The court further found certain specific acts of use of the servitude of passage by Carson Davis, who had often traversed it to gain access to the Palace property on behalf of Palace's predecessors-in-title. The court concluded from the evidence that Davis's first use of the servitude of passage occurred before February 18, 1983, and that this and later uses interrupted the running of prescription. Therefore, the court recognized the continued existence of the servitude of passage burdening the servient estate owned by Sizeler and in favor of the dominant estate owned by Palace.
However, the court found that the utility servitude that had been granted in favor of the Palace property in the 1973 Act of Sale had never been used by or for the benefit of any of the owners of the Palace property and had, therefore, prescribed for non-use. Finally, the court dismissed Sizeler's reconventional demands for injunctive relief and for monetary damages based on conspiracy, trespass, conversion, negligent damage to property, and/or damage to an oak tree growing within the servitude of passage on Sizeler's property.

STANDARD OF REVIEW
The appellate court's review of factual findings is governed by the manifest errorclearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Furthermore, when factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially *90 affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, 735; Turner v. Ostrowe, 01-1935 (La.App. 1st Cir.9/27/02), 828 So.2d 1212,

DISCUSSION
Sizeler asserts the trial court committed reversible error in finding use of the servitude of passage by or for the benefit of Palace sufficient to interrupt the prescription of non-use, and particularly because the court abused its discretion in allowing Davis to testify. Because this testimony was a key element upon which the trial court relied in concluding the servitude of passage had not prescribed for non-use, we address first the propriety of the court's decision to allow Davis to testify.
Admission of Carson Davis's testimony
The parties conferred and filed a joint pre-trial order on May 23, 2001; trial was scheduled to begin May 31. Davis was not listed as a witness on the pre-trial order by Palace or any other party, nor had Palace disclosed his identity in discovery. However, on May 24, counsel for Palace faxed a letter and several documents to Sizeler's attorneys, advising that Palace had just that morning received those documents and planned to introduce them "pursuant to [Carson Davis's] testimony with respect to visits to the property owned by Palace Properties, LLC, accessing C.M. Fagan Drive as well as timber cutting and bulldozing work conducted on the property from 1990 to 1993." Sizeler apparently voiced its objection to Davis's participation, and on May 29, Palace's counsel reiterated the intention to offer him as a witness, stating in a letter:
With respect to your opposition to my offering Mr. Carson Davis as a witness, I informed you of Mr. Davis' testimony on the same day that I discovered his knowledge of and participation in the development of property currently owned by Palace Properties, in the late 1980's and early 1990's. I was talking with an attorney in an unrelated matter who reminded me that Mr. Davis might have participated in the sale of this property when it was owned by Mr. [Poirier].
Sizeler filed a motion in limine to exclude Davis's testimony; the trial court held a pre-trial conference at which the motion was denied.[12]
When Davis testified at the trial, he confirmed that he was present in the offices of Palace's attorney when the May 24 letter was dictated and sent and that this meeting was their first discussion of the extent of his familiarity with the property. Depositions in the record indicate that Davis's name had been mentioned in other contexts by other witnesses, but those comments did not suggest that Davis had ever physically visited the property. After allowing Davis to testify over Sizeler's renewed objection, the trial court left the record open for two weeks to allow Sizeler to produce evidence rebutting Davis's testimony. None was submitted.
*91 A trial judge has great discretion in conducting a trial. The judge is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. art. 1631; Pino v. Gauthier, 633 So.2d 638, 648 (La.App. 1st Cir.1993), writs denied, 94-0243 and 94-0260 (La.3/18/94), 634 So.2d 858 and 859; Hurts v. Woodis, 95-2166 (La.App. 1st Cir.6/28/96), 676 So.2d 1166, 1174. The judge's discretion includes the admissibility of a witness's testimony. Combs v. Hartford Ins. Co., 544 So.2d 583, 586 (La.App. 1st Cir.), writ denied, 550 So.2d 630 (La.1989). It is only upon a showing of a gross abuse of discretion that appellate courts have intervened. Pino, 633 So.2d at 648.
The pre-trial order controls the subsequent course of the action, but it can be modified at trial to prevent manifest injustice. LSA-C.C.P. art. 1551(B). If a party objects to the offered testimony of a witness not listed on the pre-trial order, a trial judge has great discretion in deciding whether to receive or refuse the testimony objected to on the grounds of failure to abide by the rules, but any doubt must be resolved in favor of receiving the information. Abdon Callais Boat Rentals, Inc. v. Louisiana Power and Light Co., 555 So.2d 568, 576 (La.App. 1st Cir.1989), writ denied, 558 So.2d 583 (La.1990); Curry v. Johnson, 590 So.2d 1213, 1216 (La. App. 1st Cir.1991). When a party has not satisfied the technicality of supplementing responses to interrogatories, the reviewing court can look to the record for a willful or negligent failure to disclose names of witnesses in determining whether the trial judge abused his discretion. Abdon Callais Boat Rentals, Inc., 555 So.2d at 576.
Having reviewed the record in the light of this jurisprudence, we find no abuse of discretion by the trial court in allowing Davis to testify. It is clear that the intensity of this litigation continued right up to the day of trial, with both parties finalizing their trial preparations even after the pre-trial order had been entered.[13] Davis's name had come up in depositions very brieflyonce in connection with a corporation that had a prior ownership interest in some of the Palace property and once with reference to negotiations with the Drainage District regarding the abandonment and relocation of the old canal. There was no mention in those depositions that Davis might have used the servitude of passage to gain access to the property for or on behalf of Palace or its predecessors-in-title. Clearly, this was a key fact and, had Palace been aware of it before May 24, there would undoubtedly have been earlier meetings with Davis. There was no reason for the court to doubt Davis's credibility when he said the May 24 meeting was his first meeting with counsel for Palace concerning the matter. The trial court was very familiar with the strenuous efforts of the parties and their counsel to bring this case to trial without further delays; it must have believed that Palace was neither negligent nor willful in failing to list Davis on the pre-trial order, but simply did not previously know the full nature of his involvement with the Palace property. Therefore, the trial court acted within its vast discretion in allowing Davis to testify.[14]
*92 Disallowance of Sidney W. Lassen's testimony
These same precepts guide this court's decision concerning another of Sizeler's arguments, namely that the trial court abused its discretion by not allowing Lassen to testify. After the first day of the trial, when Palace had presented its case-in-chief, Sizeler indicated that it intended to call Lassen the following morning; Palace objected on the grounds that he was not listed as a witness for Sizeler on the pre-trial order and that it would have no opportunity to depose him at this late date concerning the substance of his testimony on Sizeler's behalf.[15] The following morning, counsel for Sizeler stated that the purpose for calling Lassen related to its affirmative defense of the failure of a resolutory condition, in that Lassen would testify that the servitude of passage was granted to Palace in the 1973 Act of Sale in exchange for the servitudes of drain in favor of Sizeler. Sizeler intended to argue that by filling in the old canal, Palace had breached a resolutory condition of the contract. Therefore, by its interference with the drainage servitude, Palace had lost its right to the servitude of passage. The trial court noted that this appeared to be a legal argument based on a self-proving documentan authentic act not susceptible to this kind of interpretation by parol evidenceand that the factual basis for the claim, Palace's filling in of the old canal, had already been established.
After considerable discussion, the court ruled that Lassen would not be allowed to testify, and suggested that he be called to the witness stand for his testimony to be proffered. However, Lassen was not in court, but was in New Orleans, awaiting the result of the court's ruling before traveling all the way to court to testify. For the convenience of all concerned, counsel for Palace then agreed to stipulate that, if called, Lassen would testify in accord with the following summary offered by Sizeler's counsel:
If Mr. Lassen were called as a witness, he would testify that at the time of the acquisition of the property, he gave to Lambert and Lyons a servitude of passage in return for the servitude of drain; ... and that the bargain was one for the other, that the utility servitude granted did not include a water servitude; and that there was no notification received by him from either the drainage board or from Lambert and Lyons regarding the relocation of the drainof the gravity district servitude. And he didn't consent to it.
We find no abuse of the trial court's discretion in disallowing Lassen's testimony. As a factual matter, it would have been cumulative, as every factual statement in the proffer was already a matter of record. As a legal matter, Lassen's intent in executing the 1973 Act of Sale *93 could not have been admitted to alter or interpret the clear provisions of that authentic act. Moreover, the other issues, such as the scope of the utility servitude and the effect of the relocation and abandonment of the old canal, were also legal issues that could not have been influenced by any opinion or factual information Lassen might have provided. Therefore, the decision not to allow his testimony was within the trial court's discretion and did not prejudice Sizeler.
Servitude of Passage/Prescription of Non-use
The 1973 Act of Sale used the following language in creating and describing the servitude of passage:
As an additional consideration for the sale and in consideration of the reciprocal grants themselves, Vendors and Purchaser do grant unto each other the following servitudes, to-wit:
(1) Purchaser hereby grants and sets over unto Vendors for the use and benefit only of the property owned by Vendors that is adjacent to the northernmost and westernmost boundary of the Property and for the use of the Vendors, their heirs and assigns, ... a servitude of passage for use in common with Purchaser, his heirs and assigns,... over and upon the property outlined on the Survey, identified thereon as "Proposed Servitude for Vendor" (except as herein modified) being (a) 1 foot distant from and parallel to the northernmost boundary of the Property, 49 feet in width and 1254.10 feet in length running from the easternmost boundary of the Property to the intersection of the northernmost boundary of this servitude of passage and the easternmost boundary of the drainage servitude identified in Item 3 below; (b) at which point this passage servitude runs along the northernmost boundary of the Property to the westernmost boundary of the Property and is 50 feet in width and 200 feet in length; (c) thence running along the westernmost boundary of the Property from its northernmost boundary for a distance of 1090 feet and 50 feet in width. Neither Purchaser nor Vendors shall be obligated to pave any portion of this passage servitude or to maintain same except as hereinafter provided, but in the event Purchaser or Vendors do pave such servitude area[,] it shall be at the expense of the party causing the paving[,] and maintenance shall be at the expense of the party desiring the maintenance except as hereinafter provided. Both parties acknowledge that such paving would enure (sic) to their mutual use and benefit[,] and if either party thereafter desires to remove any portion of the paved area for maintenance or repair of their utility lines within the area of Vendors' servitude of passage, the party which has removed same agrees to promptly restore the paved area, at its expense, to the condition in which it existed prior thereto.... It is a further condition of this agreement that before Vendors commence any work of paving, maintenance, removing paving or restoration thereof they shall provide Purchaser with a bond for payment and performance of the work in an amount sufficient to cover the cost of the work[,] which bond shall be written by a surety company licensed to do business in the State of Louisiana and which bond shall run in favor of Purchaser. Nothing in this grant of servitude shall be construed to prevent Purchaser from installing or maintaining any utility (including sewerage and drainage) lines beneath this passage servitude outside of the utility servitude granted in Item 2 below and[,] to the extent that installing and maintaining such lines interrupt passage over *94 the passage servitude area, same shall not constitute a breach hereof.
Sizeler argues that the servitude of passage in favor of Palace, as the owner of the dominant estate, prescribed due to ten years non-use, pursuant to Louisiana Civil Code article 753.[16] A predial servitude, such as this servitude of passage, is preserved by the use made of it by anyone, even a stranger, so long as it is used as appertaining to the dominant estate. See LSA-C.C. art. 757. Referring to a servitude of passage in Latour v. Francis, 417 So.2d 485 (La.App. 1st Cir.), writ denied, 420 So.2d 983 (La.1982), this court approved language interpreting the phrase, "so long as it is used as appertaining to the dominant estate," as requiring that "someone must use the property for the purpose of going onto that property for some legitimate purpose, either to see the owner or for something connected with the use of that property." Latour, 417 So.2d at 489. Furthermore, the only use that will interrupt prescription is use in the manner contemplated by the grant of the servitude. Ashland Oil Co., Inc. v. Palo Alto, Inc., 615 So.2d 971, 973 (La.App. 1st Cir.1993). A partial use of a servitude constitutes use of the whole. LSA-C.C. art. 759; Church v. Bell, 00-0286 (La.App. 1st Cir.3/28/01), 790 So.2d 82, 85, writ denied, 01-1214 (La.6/15/01), 793 So.2d 1247. Non-use is measured from the date of last use of the servitude. LSA-C.C. art. 754; Broomfield v. Louisiana Power & Light Co., 623 So.2d 1376, 1378 (La.App. 2nd Cir.1993). When the prescription of non-use is pled, the owner of the dominant estate, in this case, Palace, has the burden of proving that someone has made use of the servitude in the manner contemplated by the grant of the servitude and as appertaining to the dominant estate during the period of time required for the accrual of prescription. See LSA-C.C. art. 764.
The servitude of passage was created on September 17, 1973, in the 1973 Act of Sale. Although it has a north-south component along the western boundary of Sizeler's property and an east-west component along the northern boundary of Sizeler's property, it is clear from the language creating it that there is only one servitude of passage, and therefore, use of any portion of it constitutes use of the whole. To prevent a judgment declaring it had lost that servitude due to ten years of non-use, Palace had to prove legally sufficient use of the servitude of passage before September 17, 1983, as well as later uses, such that no ten-year stretch of non-use occurred.
The trial court found two ways in which use of the servitude of passage had interrupted prescription. First, the court noted that in 1981, the construction of C.M. Fagan Drive began; a portion of it was built on the same property along Sizeler's northern boundary as that encumbered by the servitude of passage. By December 1982, this street was opened to the public; it provided convenient access to the mall, as well as becoming a "major cross town artery." In reasons for judgment, the trial court stated:
This Court believes that the immediate use by innumerable members of the public inures to the benefit of the then owner of the dominant estate in that his property instantly becomes immeasurably more valuable. This Court believes that such use by the public of the servitude of passage is such a use appertaining *95 to the property such as to interrupt the prescription of nonuse.
Secondly, the court found that Carson Davis had used the servitude of passage to gain access to the Palace property several times before C.M. Fagan Drive was built. His first use occurred before September 17, 1983. Davis also had later involvement with the property and its development, "always within the next succeeding ten year period." Therefore, the court concluded that Davis's use of the servitude of passage to gain access to the Palace property interrupted the running of prescription.
Although the trial court's factual description of the construction and use of C.M. Fagan Drive is supported by the evidence, we disagree with the trial court's legal conclusion that its use by the motoring public was use of the servitude of passage "appertaining to the dominant estate," such that prescription was interrupted by that use. The public use of this roadway was not for the purpose of going onto the Palace property for any reason connected with that property. Rather, the public use of C.M. Fagan Drive served the purpose of carrying vehicles and people past and through the Palace property to get somewhere else. Such travel was not purposive use of the servitude of passage for the benefit of the dominant estate.
However, William Bodin, a civil engineer and land surveyor who was the project engineer for the City of Hammond on the C.M. Fagan Drive project, testified that the then-owners of the Palace property, along with others who owned property just north of Interstate Highway 12 (1-12), were instrumental in obtaining state funding for the roadway and in having it built in that location. He said:
[T]here was this section of land between the two Highway 51s that had nono real access to anything and rather than build a service road per se, as normally, right against the north line of [I-12], it was decided it would cut sort of cross country.
So, in that sense, the extension of C.M. Fagan Drive along the northern portion of the servitude of passage and westward through the property owned by Palace's predecessors-in-title, was accomplished with their assistance for the specific purpose of providing access to those properties and enhancing the commercial potential of those properties. In order to accomplish the construction, Bodin surveyed the property upon which the extension would be built. Of necessity, that surveying in 1981 must have included the portion of the servitude of passage beyond the end of the ring road at the northwest corner of Sizeler's property.
More significantly, we find no manifest or legal error in the trial court's conclusion that the use of the servitude of passage by Davis was use "appertaining to the dominant estate" and interrupted prescription. Davis, who is a real estate broker and developer, testified that his first interest in the Palace property was in the "early '80's" when it was owned by "Mr. Benny Lambert." Davis said he was interested in buying the property from Lambert and went on the property several times before those negotiations fell through. Davis said his visits to the property occurred shortly before C.M. Fagan Drive was built, and he accessed the Palace property "from the mall's northern most driveway or street," which we have earlier referred to as the ring road. That road, which stopped about 200 feet east of the Palace property line, was built on the servitude of passage. As the trial court noted, documentary evidence in the record shows that Lambert sold the property to someone else on February 18, 1983. This *96 supports the court's finding that Davis must have used the servitude to go onto the property before that time, which is within the first ten years after the 1973 Act of Sale.
Davis subsequently listed the property for a later owner, Leon S. Poirier.[17] The listing agreement, which is in evidence, was dated June 19, 1990. Davis testified that he again went on the property on behalf of Poirier to determine the best way to market it. At this time, he "came in from the mall's entrance and drove onto the property from Fagan Drive." Again, this constituted use of the servitude of passage for a legitimate purpose specifically directed toward and connected with the Palace property. As a result of these visits, he developed a marketing plan for Poirier, which included selling the merchantable pine timber before clearing the property for development. The timber sale agreement, which is also in the record, is dated October 11, 1990. Davis testified that the timber was removed the following month, "before the rainy season" that typically comes in December. While the timbering operation was ongoing, Davis said he was on the property every day to make sure there was no damage done to the property. Davis and the timber crew accessed the property using C.M. Fagan Drive. Following the timber harvest, Davis contracted to have the property cleared for Poirier. Again, he went on the property and observed the dozer work every day to be sure it was being done properly, and again, the contractor used C.M. Fagan Drive "on the north end of the mall" to enter the Palace property.
In November 1991, Davis entered the Palace property with a potential buyer, Tom Bradshaw, who was interested in putting a WalMart Superstore on the site. Davis said that when he met with clients like Bradshaw concerning the property, "the mall is a landmark. We would meet at the mall and leave one vehicle on the mall's parking lot and drive from the mall to the property." These visits would constitute use of the servitude of passage. It is clear from Davis's testimony and the documents submitted in connection with that testimony that he used the servitude of passage on numerous occasionssometimes alone, sometimes with property owners, sometimes with potential purchasers to gain access to the Palace property for purposes directly connected to that property. These uses were factually and legally sufficient to interrupt the running of the ten-year prescription of non-use. Therefore, we find no error in the trial court's conclusion that the servitude of passage was still extant and that Palace, as the owner of the dominant estate, had the right to use and improve it, as contemplated by the 1973 Act of Sale.[18]
Trespass, Negligent Damage to Property, and Status of Oak Tree
Having found that Palace had a right to enter Sizeler's property in order to use and improve the servitude of passage, the trial court dismissed Sizeler's claims for damages from trespass and negligent damage to property. The owner of the dominant estate has the right to enter the servient estate, pursuant to Article 745 *97 of the Louisiana Civil Code, which provides as follows:
The owner of the dominant estate has the right to enter with his workmen and equipment into the part of the servient estate that is needed for the construction or repair of works required for the use and preservation of the servitude. He may deposit materials to be used for the works and the debris that may result, under the obligation of causing the least possible damage and of removing them as soon as possible.
The record shows that the trespass and property damage alleged by Sizeler occurred when contractors working for Palace entered the property to clear and begin leveling the servitude of passage. As such, these actions were within Palace's rights, as the owner of the dominant estate, to construct improvements on the servitude of passage in keeping with its purpose. Therefore, we find no error in the trial court's determination.
Additionally, the trial court noted that, unfortunately, a large oak tree is growing "smack dab in the middle" of the property encumbered by the fifty-foot wide servitude of passage. The record shows that this tree may have been damaged by the clearing work done by Palace, and Sizeler sought reimbursement for its efforts to remediate that damage and protect the root system of the tree.[19] It also sought injunctive relief to prevent any future damage to the oak tree, should the servitude of passage be upheld. The trial court denied both of these requests, stating succinctly:
This Court believes it is somewhat disingenuous for any of these parties to come in claiming to be a tree enthusiast. This is based upon the fact that Sizeler is the owner of a 40 + acre shopping center on which every tree has been cut, albeit one oak in the front. Likewise, Palace is the owner of approximately a 23 acre tract on which nearly every tree has been cut. For either to come in and claim great reverence for and interest in the survivability of this tree is just incredible.
In any regards, the servitude of passage encompasses the same. If the original parties creating the servitude of passage did not want the tree removed, they should have located the servitude elsewhere. This Court makes no ruling regarding this tree and any other regulatory authority, i.e., Hammond Zoning Regulations or Tree Ordinances. The only ruling of this Court is that the exercise of the servitude of passage takes precedence over the tree if otherwise permissible.
Like the trial court, we consider it an unfortunate circumstance that this tree has been and will be jeopardized by the work required to improve the servitude of passage. However, the 1973 Act of Sale clearly envisions the paving of the servitude of passage by one or the other of the parties to the sale, which would inevitably affect the tree growing in the middle of it. Regrettably, therefore, we find no legal error in this decision.
Servitudes of Drain
The 1973 Act of Sale created two conventional drainage servitudes in favor of the Sizeler property, as follows:
(3) Vendors do hereby grant and [set over] to Purchaser for the use and benefit of the Property a drainage servitude over, upon and below Property owned by Vendors for the use of Purchaser[,] his heirs and assigns in common with *98 the use by Vendors, their heirs and assigns[,] which drainage servitude is outlined in green and identified on the survey as drainage servitude and is more specifically identified in the public records of Tangiapahoa (sic) Parish as Parcel 22-2-D-1 subject to the existing drainage servitude in favor of a governmental authority.[20]
(4) Vendors do hereby grant and [set over] to Purchaser for the use and benefit of the Property a drainage servitude over, upon and below Property owned by Vendors for Purchaser's access to Drainage Canal W-2 L-2-B (formerly 27-B)[21] and which is identified on the Survey as "Proposed Servitude for Vendee", for use in common with Vendors, their heirs and assigns. Said drainage servitude's southwesterly corner is 150 feet from the northwesterly corner of the Property, and said servitude runs perpendicular to and from the northernmost boundary of the Property herein conveyed to the said Drainage Canal and is 50 feet in width. In the event said Drainage Canal can be relocated before May 18, 1979, Purchaser agrees to cooperate with said relocation by joining in any consents which are required by any governmental authority having jurisdiction over the affected property, provided that the drainage servitude herein granted to Purchaser is extended to the relocated canal and any existing drainage facilities of Purchaser that run through this servitude are extended to the relocated canal, all at the expense of Vendors, and provided further that said extended drainage facilities must have at least the same capacity as previously existed.[22] (footnotes added).
In its reasons for judgment, the trial court also discussed what it called the "West servitude of drainage (to W-2 L-2-B, formerly 27-B)." This is not actually a separate conventional servitude of drain,[23] but is based on language within both the North and South servitudes suggesting their original function was to provide access to the old canal on the Palace property. The point made by the trial court in that discussion was that documents in the record, including the 1973 Act of Sale, show that the owners of both properties envisioned that the old canal would be abandoned and drainage would be re-routed to a new canal at a location along the north and west boundaries of the Palace property. The then-owners of the Palace property dedicated a servitude to the Drainage District over that portion of their property to accommodate the new drainage canal, which was conditioned on its being built in three years. After several extensions of that agreement, the new canal was constructed in 1983, and the Drainage District subsequently formally abandoned its servitude over the old canal. The court found that this action was within the Drainage District's authority, and ruled "the Drainage Canal Servitude W-2 L-2-B (formerly 27-B) between points A and points B on the Clifford G. Webb map [the old canal] to be formerly abandoned."
Although not explicitly stated in those reasons, the implicit factual finding underlying all of the court's conclusions concerning *99 the drainage servitudes is that the old canal no longer served any drainage function after the new canal was built. In its discussion of the North servitude, the court stated:
It is this Court's opinion that the lateral (W-2 L-2-B, formerly 27-B) [the old canal] into which the [North] servitude contained in the original deed flowed no longer exists. It is the opinion of this Court that the said lateral has not existed since 1983 when C.M. Fagan Drive road improvements were completed. Since there is no lateral into which the servitude could drain, it is this Court's opinion that the [North] conventional servitude of drain has not been in use since 1983.
The record indicates that in connection with the construction of C.M. Fagan Drive, the drainage patterns in the area were significantly altered. Bodin testified that instead of draining from the North servitude into the old canal and south from there through the Palace property, the water flow was diverted to the north where the new drainage canal had been built. This new canal carries the water in a westerly direction toward Arnold's Creek, a major channel that drains to the south and runs along the west side of the Palace property.
In this appeal, Sizeler has raised a number of issues concerning its servitudes of drain, all of which are premised on its contention that the old canal still drained its property and that the filling in of the old canal by Palace interfered with its servitudes. At the outset, we note that Sizeler did not have a conventional servitude of drain over the Palace property where the old canal was located. The 1973 Act of Sale shows that Sizeler's North and South servitudes did not encumber that portion of the property. Therefore, the filling in of that old canal did not directly involve Sizeler's conventional servitudes of drain. What is also clear from the trial testimony is that the filling in of the old canal was a preliminary step in the development of the Palace property; as of this writing, that development has been delayed over two years as a result of this and related litigation. The plans for the development of the Palace property and the improvements to the servitude of passage include above-ground and subsurface drainage installations to take care of rainwater falling on both properties, as well as any water draining from the Sizeler property. With this background information in mind, we consider Sizeler's arguments.
A. Prescription of the North Servitude
Sizeler claims the trial court erred in finding that the North servitude had prescribed due to non-use. The map attached to the 1973 Act of Sale shows the old canal running diagonally across the northwest corner of the Sizeler property and proceeding in a generally north-south direction across the Palace property, roughly parallel to its eastern boundary. The North servitude is 50 feet wide and extends north from a point about 150 feet east of the northwest corner of Sizeler's property. When initially created, it intersected the old canal at a point north of the Sizeler property, and the 1973 Act of Sale indicates that its purpose was to provide access to that canal until its relocation.
Later development in that area included the construction of the mall and ring road, the relocation of the major drainage to the new canal further north, the extension of C.M. Fagan Drive, and the construction of Minnesota Park Boulevard to the north. A sketch prepared in February 1999 by the Hammond City Engineer, T.C. Spangler, Jr., shows the area encompassed by the North servitude extending from the north side of C.M. Fagan Drive and deadending *100 at the south side of Minnesota Park Boulevard. According to Bodin, the portion of the old canal north of C.M. Fagan Drive was completely filled in twenty-five years ago when these major construction projects were completed, and it appears from various drawings in the record that Minnesota Park Boulevard was built directly over the former channel of the old canal.
Sizeler argues that the North servitude is still used for drainage, in that C.M. Fagan Drive still has a small ditch running east-west along its north side. Rainwater runs off the road into this ditch and drains toward the west, across the land on which the North servitude is located, and into an old culvert under C.M. Fagan Drive near the northwest corner of the Sizeler property. The existence of this old culvert under C.M. Fagan Drive was confirmed by Bodin and Spangler. However, we note that all property has water flowing across and over it after every rainfall.[24] If we accept Sizeler's argument, a conventional drainage servitude could never prescribe for non-use, because at some point, water will "drain" over or across any property that is encumbered by such a servitude. Bodin, who drew the construction plans for the relocation of the drainage canal, testified that subsurface drainage now serves the purpose for which the North servitude was created. This testimony and the Spangler sketch support the trial court's factual finding. Notwithstanding Sizeler's objections, factual support is also contained in the document referred to in the trial court's written reasons for judgment, the October 1998 "Abandonment and Amendment of Drainage Right of Way." In that document, the Drainage District observed that, based on an on-site inspection of the 50 foot drainage servitude, "the servitude has not been in use since the construction of C.M. Fagan Drive and the re-routing of drainage south of C.M. Fagan Drive to the southwest." Therefore, we find evidentiary support for the trial court's factual finding, and the record as a whole does not establish that the finding is clearly wrong.
B. Interference with the South Servitude
Sizeler also assigns as error the trial court's failure to grant it a remedy for Palace's alleged interference with its South servitude.[25] Sizeler contends the trial court erred in finding that the South servitude "had never been adjusted, relocated, revoked, or in any other way acted upon," claiming the filling of the old canal interfered with its use of the South servitude. We disagree. According to Bodin's testimony, the drainage canal in the South servitude, which is just north of I-12, "was put in by the highway department at the time the interstate was being constructed." There is no evidence that any of the later construction projects, including Palace's work on its property, has altered the South servitude. The record shows that it is still intact and drains whatever water flows into it from Sizeler's property and the Palace property, ultimately carrying it to Arnold's Creek. We find no manifest error in the trial court's determination concerning it.
C. Failure of Cause/Resolutory Condition for Servitude of Passage
Under Louisiana Civil Code article 1908, a contract is bilateral when the parties *101 obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other. In such contracts, the obligation of each party is the cause of the contract for the other. See LSA-C.C. art.1908, Revision Comment (b). A conditional obligation is one dependent on an uncertain event. If the obligation may be immediately enforced, but will come to an end when the uncertain event occurs, the condition is resolutory. LSA-C.C. art. 1767.
Sizeler argues that even if, as the trial court found and we have agreed, the servitude of passage did not prescribe for non-use, it was lost due to the failure of Palace to fulfill its reciprocal obligation in the form of the conventional drainage servitudes. Sizeler interprets the 1973 Act of Sale as creating reciprocal obligations, in that Sizeler's property owed the Palace property a conventional servitude of passage and, in return, the Palace property owed Sizeler's property conventional servitudes of drain. The 1973 Act of Sale indeed contains language suggesting that the servitudes were intended as reciprocal obligations. Based on this reciprocity, Sizeler contends that when Palace filled in the old canal, it breached its obligation to provide drainage via the North and South servitudes, resulting in a failure of cause for the contract and/or the occurrence of a resolutory condition.
We find no merit in this contention. As previously noted, there was no conventional servitude of drain in favor of the Sizeler property over the property where the old canal was located. The only servitude encumbering that property was in favor of the Drainage District, which changed the drainage pattern to a new canal and abandoned that servitude. Having found that the North servitude prescribed for non-use and that the South servitude was still fully intact, there was no interference with Sizeler's conventional servitudes by Palace, such that the reciprocal obligation of Sizeler in the form of the servitude of passage was extinguished.
D. Natural Servitude of Drain
The record supports the trial court's finding that Sizeler's property is generally at a higher elevation than the Palace property, and the natural drainage from the mall flows onto and across the Palace property. Therefore, the Palace property is the servient estate and Sizeler's property is the dominant estate for a natural servitude of drain, which is not dependent on any contract. See LSA-C.C. art. 655. Having so found, the trial court ordered that the Palace property must take all waters that flow naturally from Sizeler's property onto the Palace property at the points and locations where the water naturally flows from the dominant estate onto the servient estate. Neither party contests this portion of the judgment.
However, Sizeler contends the trial court committed reversible error in holding that Palace could satisfy its obligation to provide a natural servitude of drain in favor of the dominant estate on the dominant estate. This argument is based on the following portion of the judgment:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the dominant estate [for the servitude of passage], Palace Properties, L.L.C., be and is hereby allowed to improve the servitude of passage recognized hereinabove. This Court is well aware that said improvement may well encompass the raising of the elevation of the servitude of passage. This Court specifically instructs Palace Properties, L.L.C. that it must take the water off of the dominant estate [for the natural servitude of drain] where it naturally leaves the *102 property of Sizeler Hammond Square Limited Partnership. As a result, this Court is ordering that any improvements to the said right of way must collect the water as it naturally flows off of the dominant estate's property with either a curb and gutter being of no higher elevation than the currently existing land or a collection ditch located on the servitude. Pursuant to testimony of the dominant estate's expert, a culvert between 36" and 48" would be comparable to what was there before. This Court hereby orders that should the servient estate elect to improve the said property that the said culverts begin with a 36" culvert on the north 400 feet of the said right of way and to increase in size to 48" on the south 473.52 feet of the said property. Said servient estate, as part of its improvements of its servitude of passage, may elect to locate the said 36" and 48" culverts within the confines of the servitude of passage and incorporate into the said servitude of passage improvements, those obligations encumbent (sic) upon it as the servient estate of the defendant's, Sizeler, natural servitude of drain recognized hereinabove.
The owner of the dominant estate has certain ancillary rights necessary for the use of the servitude that are acquired at the time it is established. See LSA-C.C. art. 743. Among these, the owner of the dominant estate has the right to make all works necessary for the use and preservation of the servitude at his expense. LSA-C.C. art. 744; Jackson v. Jackson, 00-2591 (La.App. 1st Cir.3/6/02), 818 So.2d 192, 198. In order to make use of the unpaved portion of the servitude of passage, Palace has to pave it. As noted by the trial court, that process will require certain leveling and fill work, which is likely to raise the elevation of some or all of the property encumbered by the servitude and interfere to some extent with the natural servitude of drain owed to Sizeler. Yet, the owner of the servient estate for a servitude of drain may not do anything to prevent the flow of the water. LSA-C.C. art. 656.
Although these rights and limitations seem irreconcilable at first glance, under the facts of this case, we conclude that one of the "works necessary for the use" of the servitude of passage is the installation of drainage. Without such construction to accommodate the flow of water from the Sizeler property, this portion of the servitude of passage could not be paved and would remain virtually unusable. This was clearly not the intention of the parties to the 1973 Act of Sale, which, although it did not obligate either party to pave any portion of the servitude of passage, stated that either party could pave the servitude area "at the expense of the party causing the paving," and that such paving would inure to the mutual use and benefit of both parties. If we were to accept Sizeler's argument concerning the installation of drainage culverts as part of the improvements to the servitude of passage, we would, in effect, be nullifying the grant of that servitude in the 1973 Act of Sale. On the other hand, to allow the paving of the servitude of passage without taking account of the drainage would be to ignore the natural servitude of drain. Under the facts of this case, therefore, the installation of subsurface or other drainage in connection with the improvements to the servitude of passage must be considered a work necessary for the use of that servitude. The evidence supports the trial court's findings concerning the necessity for such drainage and the type of construction required to provide it. Accordingly, we find no manifest or legal error in this portion of the trial court's judgment.

*103 CONCLUSION
This lawsuit has been pending for almost three years. Given the extremely adversarial nature of this lawsuit and related litigation, this court has no illusions that its affirmance of the trial court's judgment will be the last word on the subject. However, this court is convinced that the trial court's factual findings are fully supported by the evidence and are not manifestly erroneous, that the trial court's conduct of the trial was fair and impartial, and that the trial court's judgment is legally correct and eminently reasonable. Accordingly, that judgment is affirmed, and all costs of this appeal are assessed against Sizeler.
AFFIRMED.
NOTES
[1] Judge A. Clayton James, retired from the Twenty-Second Judicial District Court, and Michael A. Patterson are serving as judges pro tempore by special appointment of the Louisiana Supreme Court.
[2] The judgment also declared that a conventional utility servitude in favor of the Palace property had prescribed; neither party contests this portion of the judgment.
[3] Four related, but not consolidated, lawsuits have been filed asserting various claims concerning the properties involved in this suit. Three of those, including the instant case, are on appeal to this court. In addition, at least twenty writ applications to date have been acted upon by this court in the four lawsuits.
[4] The conveyance document is recorded in the parish records at COB 385, page 157. We will refer to it in this opinion as the 1973 Act of Sale.
[5] The servitude of passage is roughly 50 feet wide, while the utility servitude is roughly 25 feet wide.
[6] To facilitate the construction of C.M. Fagan Drive, Sizeler's predecessors-in-title donated a servitude of passage to the City of Hammond; this servitude involved the same property along the northern boundary of Sizeler's property as the servitude of passage previously granted in favor of the Palace property in the 1973 Act of Sale. The then-owners of the Palace property donated to the City of Hammond complete ownership of the portion of their property on which the roadway was to be constructed, as well as any rights they had in the affected portion of the servitude of passage. As a result of one of the related lawsuits concerning these properties, the City of Hammond abandoned its servitude of passage on Sizeler's property and closed that part of C.M. Fagan Drive to the public; traffic was re-routed to Minnesota Park Boulevard, north of the portion of C.M. Fagan Drive that was on Sizeler's property.
[7] At some point, Palace removed a portion of that fence and tried to continue clearing the servitude area.
[8] The petition was subsequently amended to add as defendants Sidney W. Lassen and Sizeler Hammond Square Limited Partnership. Palace later voluntarily dismissed its claims against Lassen.
[9] The reconventional demands named as additional defendants Robert A. Maurin, III, James E. Maurin, and Calvin Fayard; Hammond Theatres, L.L.C. and its members, Doris C. Solomon, Glenn J. Solomon, Gladys S. Brown, Gloria S. Carter, Glenda S. Bradley, and Gary N. Solomon; Palladin Resources, Inc.; Tangipahoa Parish Consolidated Gravity Drainage District No. 1; and Stirling Properties, Inc. Sizeler later voluntarily dismissed all of its claims against the named individuals.
[10] Although Sizeler describes this servitude as "the West Servitude" in its brief to this court, we will adhere to the trial court's designation of this servitude as the South servitude.
[11] The old canal was part of a system of drainage servitudes belonging to the Tangipahoa Parish Consolidated Drainage District No. 1 (the Drainage District). It was not one of the conventional drainage servitudes in the 1973 Act of Sale, but the North and South drainage servitudes had channeled water toward the old canal before the construction of the new canal and abandonment of that servitude by the Drainage District. In early 2000, as part of the preliminary site work to develop its property, Palace filled in what was left of the old canal that had been abandoned by the Drainage District.
[12] The filing date on the motion is June 1, 2001, but it is obvious from the record that the pre-trial conference was held on May 31, 2001, since Davis was the second witness for Palace that day, and before he testified, the court referred to its earlier ruling on the motion in limine.
[13] For example, on May 25, Sizeler filed a motion to amend the pre-trial order to state its objection to certain claims and evidence; that motion did not mention Davis or the documents to be introduced in connection with his testimony. On that same day, Sizeler filed a motion to compel discovery responses from the Drainage District, requesting a hearing on its motion on May 31, 2001.
[14] Given the varying factual circumstances and the discretionary nature of each such decision, when the trial court's ruling is a "close call," it rarely can be considered a gross abuse of discretion. This court must, therefore, uphold it. For this reason, this court will also generally uphold the trial court's discretionary decision not to admit certain testimony or evidence because of its omission from the pre-trial order or discovery responses. See, e.g., Highlands Underwriters Ins. Co. v. Foley, 96-1018 (La.App. 1st Cir.3/27/97), 691 So.2d 1336, 1339-40; Grayson v. R.B. Ammon & Assoc., Inc., 99-2597 (La.App. 1st Cir.11/3/00), 778 So.2d 1, writs denied, 00-3270 and 00-3311 (La.1/26/01), 782 So.2d 1026 and 1027; Southern Casing of Louisiana, Inc. v. Houma Avionics, Inc., 00-1930 (La.App. 1st Cir.9/28/01), 809 So.2d 1040.
[15] However, Lassen had been listed on the pre-trial order as a "may call" witness for Palace, and Sizeler had listed as a possible witness "[a]ny witness listed by any other party to this action."
[16] The entire section of the Louisiana Civil Code dealing with the extinction of predial servitudes was revised, effective January 1, 1978. See 1977 La. Acts, No. 514, § 1. Citations in this opinion are to the codal articles after the revision. Unless otherwise indicated, the changes in the law do not affect the issues in this case.
[17] Although the trial transcript indicates this client's name was "Portier," the documents submitted in connection with Davis's testimony show his surname was "Poirier."
[18] Because we agree with the trial court on this factual basis, we decline Palace's invitation to review the trial court's legal conclusion that prescription was not interrupted by consistent subsequent acknowledgments of the servitude of passage in later deeds in Sizeler's chain of title; we express no view concerning whether that decision was legally correct or incorrect.
[19] The record also shows that, at the request of the City of Hammond, Palace altered its plans for the paving of the servitude of passage in an attempt to bypass and spare this tree.
[20] This servitude is called "the South servitude" in the trial court's reasons for judgment and in this opinion.
[21] This drainage canal is what we have referred to as "the old canal" in this opinion.
[22] This servitude is called "the North servitude" in the trial court's reasons for judgment and in this opinion.
[23] To further confuse matters, this is also not the "West Servitude" referred to in Sizeler's brief to this court.
[24] For this reason, a natural servitude of drain cannot prescribe due to non-use. See LSA-C.C. art. 758.
[25] Although in its assignment of error, Sizeler calls this "the West Servitude," we reiterate our use of the designation given to this servitude by the trial court, namely, "the South servitude."