786 So.2d 230 (2001)
Michael Ray CARR, Plaintiff-Appellant,
v.
OAKE TREE APARTMENTS and Cross Country Management, Inc., Defendants-Appellants.
No. 34,539-CA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 2001.
*232 Osborne, McComiskey & Diaz by Daria B. Diaz, Counsel for Appellant.
The Smitherman Law Firm by W. James Hill, III, Counsel for Appellants.
Before BROWN, STEWART and KOSTELKA, JJ.
STEWART, Judge.
The plaintiff, Michael Ray Carr, was awarded general damages of $100,000 stemming from the loss of use and enjoyment of his pond, which received runoff of effluent from a sewage treatment plant operated by the defendants, Oaketree Apartments ("Oaketree") and Cross Country Management, Inc., ("CCM"). Carr appeals the judgment on the grounds that the trial court failed to award damages for repair or restoration of the pond. In answer to the appeal, Oaketree and CCM assert that the amount of damages awarded was excessive and that CCM should not be held solidarity liable for payment of damages. Upon careful review of the record, we find no error in the trial court's judgment and affirm.

FACTS
Michael Ray Carr is the owner of approximately 69 acres of land along Highway 80 East in Minden, Louisiana. Carr and his family have lived on the property since 1989. It was Carr's desire to expose *233 his children to country life. Three ponds are located on Carr's property. The pond which is the subject of this dispute is a large pond of approximately 3.9 acres located north of Carr's home, about 150 yards away from the back door.
The Carr family used and enjoyed the pond for recreational pursuits, such as camping, fishing, and swimming. The pond served as a vacation spot for the family since they were unable to take much time away from their businesses. Carr also allowed community groups, such as little league teams and scout troops, to use the pond area for a campground.
Two incidents in 1991 led Carr to discover the discharge of effluent into his pond. The first incident occurred when a foul odor and taste was noticed by Carr and his family while eating fish caught in the pond. A few months later, Carr noticed a foul odor near the pond. He discovered a ditch running into the mouth of the pond with what appeared to be raw sewage, including toilet paper and hygiene products, along the ditch. Following the ditch, Carr came to Oaketree's sewage treatment plant.
Oaketree, a 32 unit subsidized housing development, began operations on June 29, 1986. It is managed by CCM. The development included a sewage treatment plant which operated using a mechanical aeration system. Effluent was discharged from a PVC pipe directly into the ditch leading to the pond. Carr filed a complaint with the Louisiana Department of Environmental Quality ("DEQ"), which conducted an inspection of Oaketree's treatment plant on August 29, 1991. The inspection revealed that the treatment plant was not operating properly. The effluent being discharged appeared septic, was black in color, and had a bad odor. Effluent from a properly functioning plant would be relatively clear. There was an accumulation of sludge beneath the discharge pipe, indicating that excessive solids were being discharged. Additionally, sewage fungus was seen growing in the ditch downstream from the treatment plant. The problem was found to be a broken air pipe which prevented proper aeration. Arrangements were made to fix the air pipe, remove sludge from the system, and add enzymes to improve treatment efficiency. The DEQ also determined that Oaketree had not obtained a water discharge permit for its treatment facility. Oaketree completed the required application and was issued a permit allowing discharge of sanitary sewage totaling less than 25,000 gallons per day to the waters of the state. The effective date of the permit was retroactive to March 16, 1989. Issuance of the permit did not convey any property rights, including servitudes, and Oaketree never obtained a servitude allowing discharge of effluent over Carr's property. Improvements were added to the sewage treatment plant over the years, including a chlorinator in 1992 and an overland flow system with a holding tank in 1994.
On December 16, 1992, Carr filed suit against Oaketree and CCM. Carr alleged that his pond was polluted by the discharge of raw sewage which occurred sometime before September 1991. He further alleged that as a result of the pollution, he lost all enjoyment and use of the pond. He prayed for damages to compensate his loss and to cover the cost to cure the polluted pond.
Trial of this matter was initially conducted over five days in September of 1997 and February of 1998. A partial judgment granting an injunction in favor of Carr was rendered on June 5, 1998, ordering Oaketree to "immediately alter the discharge of the effluent from its sewage treatment plant so that it does not run across Carr's *234 property." The judgment further ordered Oaketree to have the pond drained so that additional tests could be conducted to determine whether it was contaminated. In reasons for the partial judgment, the trial court noted that two main issues were presented. The first issue was the lack of a servitude allowing Oaketree to discharge effluent across Carr's property. Because there was no servitude, the trial court granted injunctive relief. The second issue was the determination of whether the discharge caused any damage to the pond. The trial court did not believe that it could accurately determine whether any damage had been done until the pond was drained. This was necessary to address Carr's contention that silt would have to be removed from the pond in order to restore it to its former condition and to determine whether the pond contained solid waste which would have to be disposed of at great expense in accordance with DEQ regulations.
On July 28, 1998, Carr filed a petition for contempt which alleged that Oaketree had made no attempt to comply with the partial judgment previously rendered. Thereafter, a contempt judgment was rendered on August 19, 1998, directing Oaketree to construct an earthen dam around its field absorption system, to add an emergency overflow tank, and to re-route and extend its field absorption discharge lines to the rear of the property on which the field absorption system was located in order to purge itself of the contempt charge and comply with the injunction to cease discharge over Carr's property.
The pond was subsequently drained as ordered by the trial court, and additional tests were performed on material at its bottom. Trial continued on December 2, 1998, at which time the trial court heard additional expert testimony regarding the results of the tests performed on the material from the drained pond. A final judgment and written reasons for the final judgment were rendered May 25, 1999. The trial court found that Carr suffered varying degrees of damage as a result of effluent running on to his property and that he lost the use and enjoyment of his pond, particularly as a result of the pond being drained. The trial court was convinced that the effluent contained an extremely high fecal coliform count on a fairly regular basis. This damaged the pond and prevented Carr from using it to enjoy recreational activities to the same extent that he would have otherwise. The trial court believed that the polluted condition improved and worsened continuously from 1991 through 1998. Based on these findings, the trial court awarded general damages, including damages for loss of use and enjoyment of the pond, in the amount of $100,000. In awarding damages, the trial court considered the ongoing damages that Carr and his family suffered due to the continued discharge of effluent from the time of the issuance of the partial judgment until the defendants complied with the injunctive orders. No damages were awarded for the removal and disposal of silt from the bottom of the pond. The trial court concluded that Carr did not prove that silt would have to be removed and taken to a solid waste landfill. A corrected amended judgment increasing expenses from $28,223.61 to $33,245.20 was rendered July 28, 2000.

DISCUSSION
The award of damages and the factual findings of the trial court are at issue on appeal. Carr contends that additional damages should have been awarded for restoration of the pond. He argues that the evidence establishes the presence of the sewage sludge from the treatment plant in his pond. He further argues that federal and state law prohibits the defendants *235 from disposing of sewage sludge on his property, and that the trial court's judgment forces him to assume the economic burden of complying with laws for the disposal of sewage sludge. On the other hand, the defendants assert that the award of damages is excessive and that CCM should not be held liable in solido for damages, particularly damages for contempt, with Oaketree, the owner of the apartment complex.
The trial court's factual findings are subject to the manifest error standard of review. The issue to be resolved by the appellate court is not whether the trial court was right or wrong, but whether its conclusion was a reasonable one. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993).
A trial court evaluates expert testimony using the same principles that apply to other witnesses and has great discretion to accept or reject expert or lay opinions. Orea v. Scallan, 32,622 (La.App. 2d Cir.1/26/00), 750 So.2d 483. Where experts differ in their testimony, it is the trial court's responsibility to decide which is most credible. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305; Young v. Turnipseed, 33,602 (La.App. 2d Cir.6/21/00), 764 So.2d 1172.
Much discretion is also left to the trier of fact in assessing damages in cases of offenses, quasi offenses, and quasi contracts. La. C.C. art. 2324.1. Before an award of damages may be disturbed on appeal, the record must clearly reveal that the trier of fact abused its broad discretion, based on the particular injuries and their effect upon the particular individual injured. Barr v. Smith, 25,431 (La.App. 2d Cir.1/19/94), 631 So.2d 76, writ denied, 94-0689 (La.4/29/94), 637 So.2d 466, citing Reck v. Stevens, 373 So.2d 498 (La.1979).
Liability in this instance is based on two provisions. The first is La. C.C. art. 2315 which provides, "Every act of man that causes damage to another obliges him by whose fault it happened to repair it." The second is La. C.C. art. 667, which provided, at the time of the filing of the instant suit, "Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."[1]
The record clearly indicates that the Carr property is the servient estate in relation to the property on which the sewage treatment plant is located. While a servient estate is required to accept the natural flow of surface waters, it is not required to accept the flow of effluent, even chlorinated effluent. See Smith v. Cutts, 99-253 (La.App. 3d Cir.3/15/00), 759 So.2d 851, writ denied, XXXX-XXXX (La.6/2/2000), 763 So.2d 598; Thigpen v. Moss, 504 So.2d 664 (La.App. 3d Cir.1987).
Although the water discharge permit issued by DEQ allows for the discharge of sanitary sewage into the waters of the state, this permit does not confer any property rights, such as servitudes. *236 The permit clearly states that the permittee should obtain approval from the landowner for any easements and rights of way for discharges to private land. It is undisputed that no servitude was ever obtained for the discharge of effluent to flow through Carr's property. Additionally, for almost six years, the sewage treatment plant was operated without a permit. The quality of effluent discharged during this period is unknown.
When Carr discovered the discharge of effluent through his property in 1991, he observed what appeared to be, and what he believed to be, raw sewage along the ditch leading from the treatment plant to the mouth of his pond. He filed a complaint with DEQ, and the investigation performed in response to his complaint seems to have confirmed Carr's suspicions. As stated previously, DEQ found that the treatment plant was not operating properly and that it was discharging an effluent that was black in color and septic in appearance. An accumulation of sludge beneath the discharge pipe indicated that excessive solids were being discharged. Sewage fungus was observed in the ditch downstream from the plant. Although the record indicates that the defendants replaced a broken air pipe and took other actions to remedy the problems with the discharge, how long the plant operated improperly while discharging poor quality effluent is unknown.
The discovery of the effluent discharge led Carr and his family to discontinue use of the pond. They no longer enjoyed fishing or swimming as they had previously done. They no longer allowed community groups to use the pond. Carr described the situation as an ordeal that got worse and worse. Carr testified that since 1991, he has smelled an odor along the ditch at different times. The smell is at its worst during the summer. Carr testified that he purchased the property with plans to one day construct a residential development around the pond. The discovery of the effluent discharge into the pond has impaired his ability to proceed with his plans.
The trial court concluded that the pond was in fact contaminated at various times by extremely high levels of fecal coliform, which damaged the pond and prevented Carr from using the pond as he would have otherwise. This finding is supported by the record. Upon obtaining the water discharge permit, the defendants were required to regularly sample the effluent and submit discharge monitoring reports ("DMR") on a quarterly basis. These reports are used to check whether the effluent meets discharge limitations for various items, including fecal coliform, biological oxygen demand ("BOD"), and total suspended solids ("TSS").[2] Reports submitted into evidence by Carr show that the treatment plant was out of compliance on a number of occasions from 1992 through 1997.
Dr. Robert Flournoy was hired by Carr in 1994 to conduct tests and was accepted by the trial court as an expert in environmental science with expertise in water quality and its effect on people. Dr. Flournoy concluded that the pond was contaminated with fecal coliform, the majority of which came from the treatment plant. High fecal coliform levels were seen in reports he reviewed and in his own tests. It was found along the ditch and at the mouth of the pond. Dr. Flournoy explained that lack of proper operation and *237 maintenance of small treatment plants results in a cyclical effect whereby high coliform levels are present at times, but not at others. While he did not consider the pond safe for swimming or fishing, he did testify that fecal coliform is nontoxic and biodegradable.
Wayne Roberson, who was accepted by the trial court as an expert in civil and environmental engineering, concluded from his own testing and review of other data that the treatment plant did not operate very well from 1986 through 1992, resulting in release of effluent with high levels of fecal coliform and BOD's. Roberson opined that nearly all solids released in the effluent were delivered to the pond during this same period. He believed that frequent non-compliant discharge from the plant resulted in an excessive buildup of sediment or siltation on the pond bottom. Roberson also believed that the pond was experiencing eutrophication, which he described as excessive growth of vegetation, due to the presence of phosphorus and nitrogen in the effluent. Furthermore, Roberson did not believe that implementation of the overland flow system prevented the flow of effluent through the ditch and into the pond. Because of the presence of fecal coliform, Roberson did not consider the pond safe for primary contract recreation. However, he did admit that fecal coliform die over time from exposure.
The defendants own expert in civil and environmental engineering, Dr. Lynton Bert Irish, Jr., conceded that from 1986 to 1992, prior to the installation of a contact chlorinator, nothing was eliminating bacteria in the treatment plant. He did recall seeing reports of elevated fecal coliform levels, but he testified that fecal coliform in itself is not dangerous. Rather, the presence of fecal coliform indicates that other organisms, such as viruses, could be present. Another witness for the defendants, Stanley Cothren, an expert in civil and environmental engineering, generally did not believe that effluent from the treatment system would have reached the pond. He also did not believe that any raw sewage ever got into the pond, even prior to the installation of the chlorinator. He explained that prior to the chlorinator, the sewage went through two basins-an aeration basin and a quiet basin, where sludge would settle out before discharge of the effluent. He did concede that effluent could have reached the pond at the time of the equipment failure in 1991 if the flow was continuous, but qualified his opinion by stating that the effluent would not have been raw sewage.
The trial court was faced with conflicting expert opinion, thus it was within its discretion to evaluate the testimony and decide which was most credible. We find no error in the trial court's determination that Carr's pond was damaged by the frequent presence of high levels of fecal coliform discharged into the pond with effluent from the treatment plant. The treatment plant was operated without a chlorinator for almost six years. During this period, effluent dripped from a PVC pipe directly into the ditch leading to the pond. The defendants did not have a servitude for discharge of effluent over Carr's property. Evidence further shows that high levels of fecal coliform were found in the effluent even after installation of the cholorinator and that some effluent likely continued to reach the pond even after the overland flow system was installed. Carr and his family lost the use of the pond for a prolonged period and incurred the stress and expense of testing the pond to determine the extent and effects of the contamination. Under the particular facts of this case, we find no abuse of discretion in the trial court's award of general damages.
*238 The defendants argue that CCM should not be liable in solido, as ordered by the trial court, for the award of general damages. They also argue that CCM should not be liable for any part of general damages attributable to the contempt judgment, since that judgment specified only Oaketree. CCM argues that it has no ownership interest in Oaketree, that it had no involvement in the design of the sewage treatment plant, that it has only limited management duties, and that it must get authority from either the owner or the Farmers Home Administration/Rural Development to do anything at the complex.
We first note that the interests of both CCM and Oaketree were represented by the same counsel. Our reading of the record suggests that these two defendants were closely intertwined in the operation of the apartment complex. Irene Desadier, the sole owner and officer of CCM, testified at trial. In addition to being owner and president of CCM, she is also a partner in Oake Tree Investment Corporation, which is a general partner in Oake Tree Apartments, L.L.C., the entity that owns the complex. Desadier's testimony belies CCM's argument that it performed only limited management duties. In fact, Desadier's testimony indicates that CCM was the managing authority for the complex, notwithstanding the fact that it was required to obtain approval from the owner and FHA/Rural Development for expenditures and improvements. As the day to day manager of the complex from the beginning, it is evident that CCM would have been in the best position to ensure the proper operation and maintenance of the treatment system. From our review of Desadier's testimony, we believe it shows that she acted interchangeably in her capacity as owner of CCM and as a partner with ownership interest in the complex when applying for the DEQ permit, obtaining approval for installation of the chlorinator and other improvements, or signing DMR's to be submitted to DEQ.
CCM asserts that it acted only as mandatary or agent for a disclosed principal, Oaketree, and that it cannot be considered a proprietor under La. C.C. art. 667. However, our jurisprudence is clear that proprietor under La. C.C. art. 667 is not limited to owners of the property. Rather, it has been broadly interpreted to encompass agents, contractors, and representatives whose activity causes damage to a neighbor. Chaney v. Travelers Ins. Co., 259 La. 1, 249 So.2d 181 (La.1971); Barr v. Smith, 598 So.2d 438 (La.App. 2d Cir. 1992), writ denied, 604 So.2d 998 (La. 1992). Here, CCM, as the managing authority of the apartment complex, contributed to and caused the damage sustained by Carr from the improper operation and maintenance of the sewage treatment plant which led to the discharge of effluent infected with high levels of fecal coliform. We also note that while the trial court indicated in the reasons for judgment that he considered the contempt violation in awarding damages, he did not specify any amount or percentage of the award attributable to the contempt violation. Furthermore, the final judgment does not even refer to the prior contempt violation. Appeal lies from the judgment and not the reasons for judgment. Wilson v. Wilson, 30,445 (La.App. 2d Cir.4/09/98), 714 So.2d 35. For these reasons, we find no error in the trial court's finding of CCM liable, in solido, with Oaketree for the full amount of general damages.
Finally, Carr argues that the trial court erred in failing to award damages to restore or repair the pond. The trial court rejected this claim upon concluding that Carr failed to prove it. Again, the trial court was required to weigh conflicting *239 expert testimony. Reversal is not warranted absent an abuse of discretion.
Carr's experts concluded that the discharge of effluent included an excessive amount of solids, referred to as sewage sludge, which settled on the bottom of the pond. Restoration of the pond would require removal of these solids and disposal at a solid waste landfill. Roberson initially used a "sludge judge" to sample sediment from the pond bottom.[3] The sediment sampled appeared black in contrast to the red clay and sand soil surrounding the pond. Roberson stated the he found two distinct levels-a blackish-colored level with floating debris and a gray, plastic clay material. He believed that this material was sludge from the treatment plant, but that it was not hazardous. He described it as solid waste. He also testified that because sewage sludge is organic, there is no test to positively identify it as sewage sludge. After the trial court ordered the pond drained and further testing, Roberson conducted additional tests on September 10, 1998 in conjunction with Delta Core Analysts. Roberson obtained sediment samples from the center of the pond where he believed the sludge settled. Robert Martin, who was accepted by the trial court as an expert in geology, conducted tests by running the sample through sieves of various grain sizes which were stacked one upon another. From this test, Martin and Roberson concluded that the first 33 inches of sediment exhibited characteristics different from the sediment at depths of 34 to 45 inches. According to Roberson, the first 33 inches was sludge material containing no characteristics similar to the background soils of the area. He concluded that the background soil was not the source of material in the pond and that the majority of the sludge was generated by the sewage treatment facility. To restore the condition of the pond, Roberson opined that the sludge, up to 33 inches, would have to be removed. It would be considered solid waste upon removal and would have to be disposed of at a solid waste landfill in accordance with DEQ/EPA regulations. However, Roberson also conceded during the course of his testimony that the pond would clean itself naturally over time in the absence of additional discharge.
Defendants experts also conducted tests once the pond was drained. Their conclusion was that the pond was not contaminated with solid waste and that no purpose would be served in removing sediment from its bottom. The testing was conducted by Dr. Irish and Dr. Robert G. Kalinsky, a professor of biological sciences at Louisiana State UniversityShreveport, on samples taken from within 10 to 12 feet of the pond's perimeter. Dr. Kalinsky explained that it did not make any difference where the samples were taken from in the pond because the materials and strata would be the same throughout; only depth would be different. The samples were tested for fecal coliform and fecal strep. As expected due to the pond having been drained and the bottom exposed to air and light, none were found. A water sample was also tested and proved negative, even though Dr. Kalinsky noted that the presence of fecal coliform was possible since the pond was recently drained and the treatment plant was still running. A test to determine toxicity of the material was also negative. Dr. Kalinsky described the material tested as a relatively fresh ooze with no odor. He further described the sample and the distribution of materials in it as exactly what one would expect in an old pond. Dr. Kalinsky concluded that the *240 pond was not contaminated and that the sample tested did not contain sewage sludge.
Dr. Irish reached the same conclusions as Dr. Kalinsky. He noted that the sample did not appear biologically active and that the pond bottom appeared "very normal." Regarding the stratification observed by Roberson and Martin, Dr. Irish described it as "exactly the right profile you see in a typical pond bottom." He explained that depths below thirty-four inches undergo anaerobic activity which generates carbon dioxide and methane and causes stratification to develop, with the heavier particles falling to the bottom and the less dense particles remaining on top. Using the available DMR's, Dr. Irish calculated the amount of suspended solids that would have likely exited the plant. Under a worst case scenario, he estimated that only 2.6 inches of solids could have accumulated over the years since the operation of the treatment plant. He also noted that the water discharge permit allows the discharge of some solids along with the effluent and that such discharge is not considered solid waste.
As can be seen from the testimony related above, the trial court was faced with opposing viewpoints from the experts in this matter. We cannot say that the trial court's determination that Carr did not meet his burden of proving the need to remove silt from the pond bottom in order to restore the pond was an abuse of discretion.[4] Carr's own expert testified that even if sludge was present in the pond, the pond would eventually clean itself through the workings of nature, particularly if drained and the bottom exposed to air and light. There was no showing of permanent damage to the pond resulting from the discharge of any effluent into it or of any damage requiring restoration or repair of the pond.

CONCLUSION
For the reasons discussed, we find no error in the trial court's judgment and affirm. Carr and the defendants are each assessed with one-half of the cost of the appeal.
AFFIRMED.
NOTES
[1] La. C.C. art. 667 was amended by Acts 1996, 1st Ex. Sess., No. 1, effective April 16, 1996. We have previously held that the amendments are not subject to retroactive application. See Hunter v. Town of Sibley, 32,075 (La.App. 2d Cir.10/29/99), 745 So.2d 820, writ denied, 99-3351 (La.2/18/2000), 754 So.2d 965.
[2] As defined in the permit, BOD means the amount of oxygen required by bacteria during the decay of organic and nitrogenous material in sanitary sewage. Fecal coliform refers to a gram negative, non-spore forming, rodshaped bacteria found in the intestinal tract of warm-blooded animals. TSS means the amount of solid material suspended in water.
[3] Roberson described a sludge judge as a long plastic tube fitted on one end with a valve mechanism that is used to sample liquid and sludge.
[4] Because of our determination that the trial court did not abuse its discretion in finding that Carr did not prove his claim, we need not reach the defendants' argument regarding disposal of sewage sludge in accordance with federal laws and regulations. However, we have reviewed the provisions cited and find them not applicable in this instance. For instance, 33 U.S.C.A. § 1345(a) referring to "disposal of sewage sludge resulting from the operation of a treatment works as defined in section 1292" is limited as provided in 33 U.S.C.A. § 1292 to treatment works for municipal sewage or industrial wastes. Additionally, the regulations set forth in 40 C.F.R. Part 503 et seq., apply to the final disposal of sewage sludge when either applied to the land, placed on a surface disposal site, or fired in a sewage sludge incinerator. Upon reviewing these standards and regulations, we do not find that Oaketree's treatment plant fits within these categories.