GASKINS, J.
_JjThe plaintiffs, Jack L. Fiebelkorn and Jean F. Fiebelkorn, appeal from a trial court judgment rejecting their claims for damages against the defendants, Allen Ray Alford and Janet Schultz Alford. The plaintiffs alleged that their home and lot suffered water damage after the defendants modified the adjoining lot to construct a home. For the following reasons, we affirm the trial court judgment.
FACTS
The plaintiffs’ house, located in a golf course community in Calhoun, Louisiana, was constructed in 1984-1985. The plaintiffs, who are in their 70s, purchased the house in 2005. In October 2005, the plaintiffs installed a sprinkler system and in 2006, they had a landscape designer put in extensive flowerbeds around the house. *112 The lot south of their property was vacant. The parties’ lots face the road on the east, and the golf course is behind them, on the west side. This area drains into a catch basin to the north of the properties.
The defendants purchased the lot next to the plaintiffs in 2008 and constructed a house. The plaintiffs contend that they never had problems with flooding on their lot until the defendants built their house. The plaintiffs claim that the defendants altered the drainage of the area, causing an overflow of silt onto their property, standing water in their yard, and water that came into the house, damaging their wood flooring and creating a musty smell. The plaintiffs filed suit against the defendants and trial was held in February and April 2011.
Mr. Fiebelkorn testified that he and his wife are real estate brokers and generally buy a house, live in it for several years, and then sell it. According to Mr. Fiebel-korn, at the time he bought this house in 2005, it was inspected and Rno problems were found. He stated that the drainage on the property was good and that water drained from the street to the back of the property, toward the golf course, through swales or indentions in the ground.
In October 2005, the Fiebelkorns installed a sprinkler system in the yard and in 2006, they installed flowerbeds around the house. Mr. Fiebelkorn testified that the landscaping did not cause any problems with the drainage on his property. However, after the Alfords began constructing their house on the adjoining lot, Mr. Fie-belkorn claimed his drainage and flooding issues commenced. Shortly after Mr. Alford moved dirt on the lot to build up the house pad, heavy rains washed the fill dirt onto the Fiebelkorns’ yard. Mr. Fiebel-korn said that the dirt was red and contained iron ore.
Mr. Fiebelkorn claimed that the Alfords built up their lot and changed the drainage so that all the water flowing off the defendants’ lot comes through the plaintiffs’ house. Mr. Fiebelkorn alleged that dirt from the Alfords’ lot filled up a swale that previously had drained the Fiebelkorns’ property. When the flooding problems began, Mr. Alford put sandbags out, but Mr. Fiebelkorn said they were put in the wrong place. Mr. Fiebelkorn stated that Mr. Alford put a French drain on his property, but when it gets clogged, water gushes onto the plaintiffs’ lot. Mr. Fiebel-korn contended that as a result of his drainage problems, bricks on the house are cracked, his slab is cracked and water is coming up through the slab into the house. He stated that there is mold in the cracks of the slab. The ground on one side of the house is always soft and wet and he cannot mow there or drive his golfcart on that area. He stated that since the defendants moved in, he has had water in his house 20 times.
| sMr. Fiebelkorn testified that the wood flooring in the house came up and they had to remove it and have not replaced it. According to Mr. Fiebelkorn, he could always tell how many inches of rain had fallen because the floorboards of the house would be raised by that amount. Mr. Fie-belkorn said that with the drainage problems now existing in the property, he cannot sell the house, as had been his plan.
Mr. Fiebelkorn claimed that the flooding of their house and property adversely affected his wife’s health. During the time the problems with water in the house arose, Mrs. Fiebelkorn had a pacemaker installed. Mr. Fiebelkorn stated that the stress of the situation with the house aggravated his wife’s physical condition.
Mr. Alford installed a French drain on the plaintiffs’ property, but Mr. Fiebelkorn said it is not working. He testified that *113 the French drain does not appear to be removing water from his property. According to Mr. Fiebelkorn, Mr. Alford constructed a retaining wall on his own property, but he claimed that water comes over the top of Mr. Alford’s retaining wall during heavy rains. Mr. Fiebelkorn identified material from the Alfords’ retaining wall that had washed over into his flowerbed. Mr. Alford also put a 12-inch drainage pipe on his property that empties into a catch basin. Mr. Fiebelkorn claimed that the defendants have created a situation where the water table in the ground is higher than his slab, forcing the groundwater up through his slab.
Mrs. Fiebelkorn testified that she is 70 years old and has been married to Mr. Fiebelkorn for 27 years. She stated that there were no drainage problems with the house before the Alfords began construction. After the drainage problems began, closet doors in the house were hard to open and the wood ^flooring began to come up, necessitating its removal. She stated that the concrete slab appears to have water coming up from below. Mrs. Fiebelkorn said that her husband has a seizure disorder for which he takes “heavy medication” and does not need to have a lot of stress.
Robert Hilory Quinn, Jr., sold the house to the Fiebelkoms. He testified that he purchased the house in 1990 and never had any drainage problems in the house, including during an area flood in 1991.
Brandon Antley is affiliated -with the flooring company that removed the wood floors from the Fiebelkorn home. He stated that it cost $1,550 to remove the flooring. He observed that there was moisture in the slab and mold and mildew were growing under it.
Nicholas Charles Hilburn mows the Fie-belkorns’ lawn. He stated that there were no problems with mowing before the Al-fords built on the lot next door. He observed that the Affords’ fill dirt washed onto the plaintiffs’ property and filled in the swale so that it does not drain as well. He testified that the flowerbeds are constructed so that the water drains away from the house and the weep holes are open all around the house.[1]
Foy Bryon Gadberry worked for an engineering firm and was accepted as an expert in architecture and building. He testified for the Fiebelkorns and was familiar with the area before the Affords’ house was built. He stated that the water flowed southeast to northwest on the front and flowed toward the golf course in the back. He said that the water basically sheet-flowed over the Affords’ property before construction. After they built their house, the swale |Bwhich drained the area was narrowed and created a dam for water that previously had come from the street and flowed over the Affords’ lot. He said that the construction slowed the drainage on the plaintiffs’ property. He observed that the defendants’ dirt was within two feet of the retaining wall that the defendants built and that silt was built up halfway between the retaining wall and the flowerbeds. On a later visit to the site, he observed that the ground had been sodded and the swale was not as well defined as it had previously been. He made soil bor-ings on the plaintiffs’ property which showed the presence of silt and moisture. However, he did not see any silt in the flowerbeds.
Mr. Gadberry observed that the floors in the plaintiffs’ house were buckled from *114 water damage and there was a crack in the brick on a corner of the house. He stated that moisture in the soil caused shifting and that the work on the defendants’ property contributed to the plaintiffs’ problems. Mr. Gadberry observed water seeping through the defendants’ retaining wall onto the plaintiffs’ lot. He noted that some remedial work had been done on the retaining wall to seal the cracks. He said that the defendants’ lot is 3½ feet higher than the plaintiffs’ lot at the property line. He was aware that the Alfords had placed a drainpipe on their property to catch water and drain it back toward the golf course. He thought that the swale slope on the Fiebelkorns’ lot could be reestablished to get the water off the property more quickly.
Mr. Gadberry noted that the plaintiffs’ flowerbeds were two bricks high on the house and covered the weep holes and he felt water was entering the house through the weep holes. Mr. Gadberry testified that because the flowerbeds were over the weep holes, when the soil gets saturated, it runs to |fithe lowest point, which is the foundation of the house. He stated that there is a valley in the plaintiffs’ roof on the southeast side of the house that shoots water toward the end of the flowerbed in a heavy rain. He testified that the condition of the flowerbed was conducive to water entering the house. He stated that the construction the Alfords did on their property increased the amount of water flowing onto the Fiebelkorns’ lot “slightly.” Mr. Gadberry said that the Alfords had made a reasonable attempt to catch their drainage.
Dixie Marsh Griffin, Jr., holds a Ph.D. in hydrology and environmental engineering and testified for the Fiebelkorns as an expert in those fields. He made a “Rational Method Drainage Report” on the property in 2010. Dr. Griffin stated that the property is at the bottom of a sack which catches rainwater. He noted that the swale which had previously been on the property has disappeared, so that water runs toward the Fiebelkorns’ lot. He stated that the swale had originally been three feet deep. He said that the Alfords’ house blocked off a large part of the catchment and caused a major disruption in the drainage pattern. According to Dr. Griffin, the Alfords’ house has blocked the outlet of an 11-acre catchment. However, in later testimony, Dr. Griffin stated that he had made an error in his calculations and that the area drained was actually 3½ acres, not 11 acres.
Dr. Griffin testified that the groundwater in the Alfords’ yard is between four and six feet higher than that in the Fiebel-korns’ yard. This has created a groundwater mound where, in order to equalize the pressure, the water is coming out of the ground. He said the groundwater is within one inch of the bottom of the Fie-belkorns’ slab. He used pipes placed in the ground known as piezometers to measure the level of the groundwater. He stated that the ^damage inside the plaintiffs’ house is consistent with the diffusion of groundwater up through the slab. He advised that a remedy would be to cut out the swale and underlay it with a French drain. He noted that there is a French drain on the plaintiffs’ property now, but said that it is not working. He observed that some of the plaintiffs’ flowerbeds were above the slab, but most were below. Once the swale was filled in, he opined that the flowerbeds served as dams to keep the water from flowing out. He said that it was ridiculous to argue that the plaintiffs’ problems are caused by their flowerbeds. He opined that a sprinkler system will not cause this kind of flooding. Dr. Griffin maintained that the Fiebelkorns’ problems are caused by groundwater, not surface water.
*115 Jerry Magee, the landscape designer who installed the Fiebelkorns’ flowerbeds, testified as an expert in landscape design. The Fiebelkorns’ lot had positive drainage with the swale which was 18 inches deep and three to four feet wide. There were no drainage problems when the flowerbeds were first put in. He claimed that the beds were not higher than the slab or the weep holes. He opined that the dirt placed on the Alfords’ property increased the amount of water that flowed onto the Fiebelkorns’ lot. In order to remedy the plaintiffs’ problem, he suggested that the swale be excavated and three catch basins be installed, all connected by a French drain. This would cost $5,588.56 and replacing the flowerbeds would cost $1,480.
Michael Dewayne Burroughs testified as an expert in home inspection. He inspected the Fiebelkorns’ house in 2005, before they purchased it. At that time, there were no problems with the drainage and there was no water damage in the house. When he went back to inspect the house in 2009, he used infrared 1 ^photography and moisture readings to determine that there were large amounts of water coming in and affecting the wood flooring. He stated that the defendants’ house is preventing the water from flowing off of the plaintiffs’ lot. The water pressure under the house is being forced up and water is wicking into the house.
Water stains were found underneath the flooring and he opined that the water was coming up from below. He stated that the water was not coming into the house through the weep holes. He said that if water came in through a weep hole, it would go out through another weep hole on the same horizontal plane. He stated that there would have been water damage up the walls if the water was coming in through the weep holes. Mr. Burroughs claimed that the dirt in the flowerbeds was not above the weep holes. He did not observe any rust or peeling paint which would have indicated that the water was coming into the wall cavity. As a remedy for the problems, he agreed with Mr. Ma-gee’s plan of digging out the swale and installing a French drain.
Mr. Burroughs testified as to the expense in repairing the damage to the Fie-belkorns’ house. He estimated $9,800 for removal of sheet rock to check for mold and reinstalling the sheet rock, $700 for mold remediation, $4,000 to replace the wood flooring, and $23,000 for dirt work and landscaping.
Mr. Alford testified that he studied civil engineering for two years in college and then obtained a degree in construction. When he began construction on the house at issue here, he did not employ a landscape architect or an engineer. He did not have a professional, design the drainage on the property because he considers himself to be a professional in that regard. He Iflhad a friend who is a civil engineer “shoot elevations” to determine if there was enough dirt on the lot for the house construction.
Mr. Alford began dirt work for the house in August 2008, and shortly thereafter, Hurricane Gustav passed through the area. A large amount of silt ran off his lot onto the plaintiffs’ property. He put down sandbags and hired workers to shovel the dirt out of the plaintiffs’ yard. He then built a retaining wall to keep the dirt off the plaintiffs’ property. The first retaining wall was built quickly because Hurricane Ike was due to hit the area. He later built a second retaining wall with a 12-inch drainpipe between the two walls.
After the Fiebelkorns filed suit, Mr. Alford tried to resolve the issue with them. Mr. Alford agreed to put a French drain on the Fiebelkorns’ property and was assisted in the placement of the drain by Dr. *116 Griffin. Mr. Alford stated that Dr. Griffin held the tape measure while the defendant shot elevations and used the estimate to shoot the grade. Mr. Alford said that while installing the French drain, he dug down 36 inches and found that there was no water in the hole. He claims that the drain is working as it was intended. Mr. Alford said he built a swale on his property which drains onto the golf course.
According to Mr. Alford, the causes of the plaintiffs’ water problems are their flowerbeds and roof drainage. He stated that the plaintiffs’ flower-beds are covering the weep holes of the house. He said that when it rains one inch per hour, 240 gallons per hour run off the plaintiffs’ roof into the flowerbeds. Mr. Alford said that the dirt in the flowerbeds should be six inches below the slab level to keep water away from the slab.
Hubbard Donald was retired from construction work and testified for the defendants. He stated that the property slopes from the southeast to the | innorthwest. In October 2009, he went to the property to observe a heavy rainfall. Most of the water on the Alfords’ property went into a catch basin and the rest went to a swale on the inside of the Alfords’ retaining wall. He did not observe any water going from the Alfords’ property onto the Fiebelkorns’ lot.
Vernon Robert Yepson, who knows both the Fiebelkorns and the Alfords, testified regarding his observations of the two lots. He said that the water from the Alfords’ lot drains onto the golf course. During a recent 4½ inch rain, he did not see any water going over the Alfords’ retaining wall. He stated that the water in the swale was running and not standing. He said that the rain steadily poured off the Fiebelkorns’ roof and filled the flowerbed in the front of the house. He noted that the flowerbeds installed by the Fiebel-korns in 2006 were high up on the bricks and would have flooded in a heavy rain. According to Mr. Yepson, the French drain installed by the Alfords was working well. He stated that after the Alfords built this house, he could no longer drive his golf cart on one side of the Fiebel-korns’ house, not because of the condition of the ground, but because there was not enough room between the wall and the flowerbed.
James Bernard Gaston, a bricklayer, testified that he has seen landscaping on houses that covered the weep holes and caused water to get into the houses. He worked on the Alfords’ lot to install drainpipe to keep the water off the Fiebelkorns’ property.
Mark Anthony Thomey was accepted as an expert in civil engineering. He was hired by the Alfords to evaluate the lot. He made a drainage study report for the two properties. He said that the water flows over the Alfords’ property in a sheet flow until it reaches a drainage collection structure and that | pit is a virtual impossibility for any water to flow from the Al-fords’ lot onto the Fiebelkorns’ property. He noted that with an event like a hurricane, there might be some overflow onto the Fiebelkorns’ property, but with lesser storm events, the drainage structures are adequate. He stated that the ground elevation of the Fiebelkorns’ flowerbed is above the elevation of the slab and that the water in the flowerbeds drains to the south wall of the Fiebelkorns’ house and then travels west along the wall to the golf course. He said that in a rain of one inch per hour, 300 gallons of water would go into the Fiebelkorns’ flowerbed, but the water from the Alfords’ property would be intercepted by the swale.
Mr. Thomey did not agree with Dr. Griffin’s theory about a ground-water mound. He did not think that Dr. Griffin had con *117 ducted a sufficient groundwater hydrostatic pressure evaluation to make a definitive determination.
Mr. Thomey observed the inside of the Fiebelkorns’ house and concluded that some damage was due to water and some was attributable to normal foundation settling and movement. He stated that no water from the street was coming across the property.
Roy David Jones has a degree in civil engineering and works with house foundations. He stated that the years prior to Hurricanes Gustav and Ike were relatively dry. He determined that the damage to the Fiebelkorns’ house was caused by drainage from the roof and the flowerbeds. He stated that, for every inch of rain that falls, the roof puts 800 gallons of rain into the flowerbeds and the water is trapped by the clay soil. He also noted that the flowerbeds were above the weep holes of the house.
112When asked about Dr. Griffin’s use of piezometers to measure groundwater, Mr. Jones said that four piezometers in the area of the flowerbeds are not sufficient to determine the presence of groundwater. He said that the surface soils are basically a clay type, which are impermeable, and that it is very difficult for there to be ground water in that type of soil as shallow as three feet. He further stated:
It is my opinion that this water is water that is migrating from the flowerbeds into these piezometers that are in the vicinity of the flowerbed. And it’s also based on the fact that due to the French drain that was installed at a location selected by Dr. Griffin, myself, Mr. Alford, and Mr. Fiebelkorn, that that was installed at a depth of approximately three feet below the existing ground surface, and it was installed dry while water was still in the piezometers that were within a few feet of this open trench. To me, that indicates that the water did not come from the Alfords’ residence toward the Fiebelkorns’ but from the Fiebelkorns’ toward the Al-fords’.
He opined that it takes a substantial amount of water to saturate clay soil to a sufficient depth beneath the structure so as to create a volumetric swell and pressures in an upward direction. His opinion was that the Fiebelkorns’ problems were not caused by groundwater; he said the problem was surface water. He suggested that dirt work be done on the side of the Fiebelkorns’ house so as to form a positive grade away from the house.
On November 11, 2011, the trial court signed and filed a judgment in favor of the Alfords, dismissing the Fiebelkorns’ claims with prejudice. The trial court stated that it considered the lay and expert testimony, as well as making a visit to the site. The court found that the Fiebelkorns failed to carry their burden of proof. The Fiebel-korns appealed.
On appeal, the Fiebelkorns argue that the trial court erred in failing to find that the Alfords were negligent and were liable under La. C.C. arts. 2315, | 1S656, and 667, for the flooding and drainage problems which damaged the plaintiffs. According' to the Fiebelkorns, the Alfords were in violation of La. C.C. art. 656 in making a servitude of drainage more burdensome on the servient estate. They contend that the Alfords created a groundwater mound which increased the groundwater pressure on the neighboring property, resulting in damages to the property and to the plaintiffs. The Fiebelkorns maintain that the Alfords conducted work on their lot which led to the filling and blocking of the drainage swale of the Fiebelkorns’ property. They claim that this increased the flow and rate of flow of water, resulting in flooding and damage to the Fiebelkorns and their *118 property. The Fiebelkorns argue that the trial court erred in failing to award them general and special damages and costs.
LEGAL PRINCIPLES
General tort liability is imposed by La. C.C. art. 2315 which provides in pertinent part:
A. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
B. Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person....
The servitude of natural drain is set forth in La. C.C. arts. 655 and 656. La. C.C. art. 655 provides:
An estate situated below is bound to receive the surface waters that flow naturally from an estate situated above unless an act of man has created the flow.
La. C.C. art. 656 states:
The owner of the servient estate may not do anything to prevent the flow of the water. The owner of the dominant estate may not do anything to render the servitude more burdensome.
114 Accor ding to La. C.C. art. 655, the natural servitude of drainage exists only for natural water flow and not for water flow created by “an act of man.” An owner whose land drains naturally onto the land of his neighbor may install conduits on his own land, and on the neighbor’s land with the neighbor’s permission, to concentrate and speed the flow of water beyond the slow natural process by which it would ultimately reach its destination, provided this does not increase the amount of water that flows over the neighbor’s land. Tool House, Inc. v. Tynes, 564 So.2d 720 (La.App. 2d Cir.1990), unit denied, 568 So.2d 1087 (La.1990).
The right to make work on an estate is set forth in La. C.C. art. 667 which states in pertinent part:
Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care....
As a general rule, the landowner is free to exercise his rights of ownership in any manner he sees fit. He may even use his property in ways which occasion some inconvenience to his neighbor. However, his extensive rights do not allow him to do real damage to his neighbor. In determining whether a work or activity occasions real damage or mere inconvenience, a court is required to determine the reasonableness of the conduct in light of the circumstances. This analysis requires consideration of factors such as the character of the neighborhood, the degree of intrusion and the effect of the 1/¡activity on the health and safety of the neighbors. Atkins v. Six C Properties, L.L.C., 45,682 (La.App.2d Cir.11/3/10), 55 So.3d 120.
Where recovery is based on an owner’s use of property that causes damage to a neighbor, the injured party must establish causation between the owner’s action or inaction and the damage resulting from the defendant-owner’s act or *119 omission. Haworth v. L’Hoste, 95-0714 (La.App.4th Cir.11/30/95), 664 So.2d 1335, writ denied, 96-0408 (La.3/29/96), 670 So.2d 1235.
An appellate court may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” The issue to be resolved by the appellate court is not whether the trial court was right or wrong, but whether its conclusion was a reasonable one. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart v. State, through Department of Transportation and Development, 617 So.2d 880 (La.1993). Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Taylor v. Haddox, 42,557 (La. App.2d Cir.10/31/07), 968 So.2d 1200, writ denied, 2007-2368 (La.2/1/08), 976 So.2d 724.
A trial court evaluates expert testimony using the same principles that apply to other witnesses or lay opinions. Where experts differ in their testimony, it is the trial court’s responsibility to decide which is most credible. Carr v. Oake Tree Apartments, 34,539 (La.App.2d Cir.5/9/01), 786 So.2d 230, writ denied, 2001-1682 (La.9/21/01), 797 So.2d 675.
|1fiDISCUSSION
Although in the present case the trial court gave very limited reasons for judgment, it did state that it considered the lay and expert testimony and visited the site. The trial court found that the Fiebelkorns failed to carry their burden of proof.
As stated earlier, the servitude of natural drainage exists under La. C.C. art. 655 and provides that the estate situated below is bound to receive surface waters that flow naturally from an estate situated above, unless an act of man has created the flow. Under La. C.C. art. 667, the owner of an estate cannot make any work on it which deprives his neighbor from enjoying his own or which may be the cause of any damage to him. To prove liability under La. C.C. art. 667, there must be proof of causation and damages.
In the present case, the Fiebelkorns presented lay and expert testimony tending to show that the construction of the Alfords’ house caused excess amounts of water to collect on the Fiebelkorns’ property, raising the level of groundwater, which resulted in water wicking into the house through cracks in the slab.
The Alfords presented lay and expert testimony tending to show that the Fiebel-korns’ water damage was caused by the installation of a sprinkler system and extensive flowerbeds which covered the weep holes of the house and collected rainwater falling off the Fiebelkorns’ roof. The flowerbeds were installed in 2006 and the Al-fords built their house in 2008. Although the Fiebelkorns claim that they did not have water damage until the Alfords built their house, there was testimony that several years prior to 2008 were dry and in _Jjj2008, during the construction of the Al-fords’ house, two hurricanes passed through the area in close succession.
Many of the experts, including some offered by the Fiebelkorns, stated that in some places, the flowerbeds were covering weep holes of the house and that water standing in the flowerbeds was the source of the Fiebelkorns’ water damage. There was expert testimony establishing that the Alfords have employed extensive measures to prevent water from their property from flowing onto the Fiebelkorns’ lot. These measures included the installation of two retaining walls, several drainpipes, French drains, catch basins, and swales on the *120 Alfords’ property as well as the installation of a French drain on the Fiebelkorns’ lot.
Although some of the Fiebelkorns’ experts stated that the construction of the Alfords’ house caused the water damage to the Fiebelkorns’ house, this was basically a battle of experts where the plaintiffs’ witnesses claimed that the water damage was caused by the Alfords’ construction and the defendants’ experts opined that the problem was caused by the Fiebelkorns’ landscaping, sprinkler system, and roof runoff. The trial court found that the evidence and testimony offered by the Al-fords was more credible. In this matter, we cannot say that the trial court’s determination was manifestly erroneous or clearly wrong. The trial court’s conclusion was reasonable and we affirm its judgment.
CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court in favor of the defendants, Allen Ray Alford and Janet Schultz Alford, rejecting the claims of the plaintiffs, Jack L. Fiebelkorn and Jean F. Fiebelkorn. Costs in this courts are assessed to the plaintiffs.
I,«AFFIRMED.

. Weep holes are openings in the brick to allow water vapor to escape from the confined walls of the house.